SULLIVAN, Appellant, v. STRATHAN-HUTTON-EVANS
COMMISSION COMPANY.

### Division One, November 14, 1899.

1. **Libel**: PRIVILEGED COMMUNICATION: BURDEN OF PROOF. Every defamatory publication *prima facie* implies malice, but where the communication is made in good faith, upon any subject-matter in which the communicant has an interest or in reference to which he has a duty, legal, moral or social, to a person having a corresponding interest or duty, it is privileged, and the privilege rebuts the presumption of malice, and the burden is cast upon the party complaining to prove express malice.

2. ———: ———: MUTUAL INTERESTS. But the interest in the subject-matter must be common to both parties, the person communicating and the recipient of the communication, for example, two customers of the same bank, two directors of the same company, two creditors of the same debtor, two officers of the same corps, two executors or trustees, an attorney and client, etc., and to come within the term "privileged communication," the statement must be such as the occasion warrants, and must be made *bona fide* to protect the private interests both of the speaker and the person addressed. Extraneous matters with which the person addressed is not concerned are not privileged.

3. ———: ———: WORDS IN LETTER: A cattle dealer in Texas who was a stockholder in defendant company owed defendant $29,000 in notes secured by mortgage on cattle, and had arranged with plaintiff to pay the debt. Plaintiff who had more money in a St. Louis bank than the debt amounted to, wrote the bank to pay defendant the money on a release to him of the mortgage and an indorsement of the notes to him without recourse, but defendant insisted on canceling the notes (a gratuitous condition on his part), which alone delayed the payment of the money for a few days. Two days before defendant transferred the mortgage and notes according to plaintiff's instructions and received the money from the bank, defendant wrote the cattle dealer: "We know Sullivan very well, and firmly believe he has misinstructed his St. Louis bank here in order to make interest on your money. We sincerely hope for your own good and ours, too, that you will never have anything more to do with Sullivan when the business has to come through

our hands, as we do not like his business methods, and we are afraid to deal with him." This letter was shown Sullivan, and the writer stated to the cattle dealer that the letter was intended for Sullivan to see. *Held*, that it was not a privileged communication, and the words were actionable.

4. ———: ———: ———: MATTER FOR COURT: MALICE. Whether or not words used in a letter are a privileged communication is a question of law for the court, but malice is a question of fact for the jury if there is any evidence of malice.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL D. FISHER, Judge.

REVERSED AND REMANDED.

LUBKE & MUENCH and CHARLES W. OGDEN for appellant.

(1)    While a portion of the letter of July 3, 1895, written by the defendant to J. M. Chittim, referred to a business transaction in which they had a common interest, still the court erred in holding that the portion of that letter which is made the basis of this action is privileged. (a) In making a communication which is only privileged by reason of being made to a person interested in the subject-matter thereof, the writer must be careful not to branch out into extraneous matter with which he is not concerned. The privilege only extends to that portion of the communication in respect to which the parties have a common interest or duty. Newell on Defamation, Slander and Libel, p. 532; Odgers on Slander and Libel, 245; Callahan v. Ingram, 122 Mo. 356; Arnold v. Sayings Co.,. 76 Mo. App. 180. (b) He must also be careful to avoid the use of exaggerated expressions, for the privilege may be lost by the use of violent language when it is clearly uncalled for. Newell on D., S. and L., p. 532. (c) Any one in the transaction of business with another has the right to use language, *bona fide*, which is relevant to that business, and which a due regard to that business makes neces-

sary, even if it should directly or by its consequences be injurious or painful to another; and this is the principle upon which privileged communications rest; but defamatory comments upon the motives and conduct of the party with whom he is dealing does not fall within this rule.      Tuson v. Evans, 12 A. and E. 733.      (d)   A communication made by a person is privileged which a due regard to his own interests renders necessary.   He is entitled to protect himself.   In such cases, however, it must appear that he was compelled to employ the words complained of.   If he could have done all that his duty or interest demanded without libeling or slandering the plaintiff, the words are not privileged.   It is very seldom necessary, in self-defense, to impute evil motives to others, or to charge your adversary with dishonesty or fraud.   Newell on D., S. and L. 509.      (2)   The court erred in instructing the jury, at the request of the defendant, that there was no proof of express malice.   Newell on D., S. and L., 315, 324, 331, 340, 341 and 349.      (3)   The court erred in refusing to submit the cause to the jury, sworn to try all the issues therein. Fowls v. Bowen, 30 N. Y. 20; Lathrop v. Hyde, 25 Wend. 148; Newell on D., S. and L. 392; Constitution, art. II, sec. 14.

J. M. HAMILTON and D. P. DYER for respondent.

(1)   The letter was privileged.   Newell on Slander and Libel, pp. 388, 389, 391, 478 and 523; Behee v. Railroad, 71 Tex. 428; Railroad v. Richmond, 73 Tex. 576.      (2)   It was the province of the court to decide whether the communication was privileged.   13 Ency. of Plead. and Prac., p. 107; Sunderlin v. Bradstreet Co., 46 N. Y. 191; Locke v. Bradstreet Co., 22 Fed. Rep. 773; Mitchell v. Bradstreet Co., 18 Fed. Rep. 214; Press Co. v. Stewart, 119 Pa. St. 603; Hull v. Lyon, 27 Mo. 570.      (3)   The evidence fails to show any malice upon the part of Evans (the writer of the letter) that can be charged against the defendant corporation.   South-

ern Express Co. v. Fitzner, 59 Miss. 581; Railroad v. Richmond, 73 Tex. 575; Odgers on L. and S., 359.

MARSHALL, J.—Plaintiff is the senior member of the firm of D. Sullivan & Co., which company is engaged in the banking business at San Antonio, Texas.    Defendant is a business corporation, organized under the laws of Missouri, and A. D. Evans is its secretary.    J. M. Chittim is a large cattle dealer in Texas and held ten thousand dollars of the stock of the defendant company.    Prior to the 24th of June, 1895, the defendant had loaned Chittim $50,000, which was evidenced by his note to it, secured by a mortgage on 4,150 head of cattle, of which 2,500 were in the Thornton pasture, in Bee county, Texas, and 1,600 in other pastures.    The $50,000 secured note was dated October 18th, 1894, and matured about April 21st, 1895.    About the first of April, 1895, Chittim paid defendant $10,000 on account, and executed renewal notes (the record does not show how many) for $40,000 which matured at different dates between the 13th and 28th of June, 1898.    Chittim paid $11,000 of these renewal notes before June 24th, 1895.    Some time prior to June 24th, 1895, the defendant notified Chittim that he must meet his notes at maturity, as it was in need of funds.    To enable himself to do so, Chittim applied to D. Sullivan & Co., for a loan of $35,000, to be secured by his mortgage and notes held by defendant, and on the 24th of June, 1895, Sullivan & Co. made the loan, and on the same day Sullivan & Co. wrote to defendant that Chittim "requests us to ask you to send releaces for his cattle in Bee county to us, and we will submit them to Mr. Chittim, and if everything proper we have instructions to remit you amount.    He also says the amount is about $25,000.    Mr. Chittim also requests you to send us his stock he has in your company by express."    On the 26th of June, 1895, defendant replied to Sullivan & Co.:    "We have your letter of 24th inst., and have sent the same to our Kansas City

office, as they hold the Chittim paper, amounting to about $25,000. You will hear from that office in due course of mail. Agreeable to your request we send you, Pacific Express to-night, J. M. Chittim's stock in our company." On the 28th of June, 1895, defendant wired Chittim: "Have Sullivan wire his St. Louis bank to pay us twenty-nine thousand dollars on receipt of mortgage released to Sullivan & Co., covering forty-one hundred fifty cattle in Thornton pasture. This will make your individual account about even at this office, and leave you owing Kansas City five thousand dollars, maturing July 17th, which we will extend for you. Answer." On the 29th of June, 1895, Sullivan wired defendant: "We wrote Boatmen's Bank to-day to pay you $29,000, on delivery to them of proper release of Chittim cattle." On the same day Sullivan wrote the Boatmen's Bank of St. Louis: "The Strahorn-Hutton-Evans Com. Co., National Stock Yards, Illinois, will present to you mortgage and releases covering 4,156 head of cattle of J. M. Chittim, in Thornton pasture, Bee county, Texas, and upon delivery to you of mortgage, releases and notes of J. M. Chittim, covering said mortgage, you will please pay them $29,000 and charge our account with same. Send us all papers by express at the value of $10." On the same day Chittim wrote defendant: "Just in receipt of your letter and statement. I do not fully understand. I owed individually $50,000 at St. Louis, and $25,000 K. C. I placed $25,000 cash your office and $5,000 cash K. C., and total of $30,000, and as I have never got all sale of the Chittim and Lasater cattle do not know what they amount to. I wish to have a full statement, as I am so thick-headed unless everything is very plain I can not understand it. I wish you would please itemize each transaction. I see $50.00 one time exchange and int. and the total acc't shows $36,868.58. Please let me have a full statement and what amount you placed at K. C., and total amount you received from Chittim and Lasater cattle. You speak of open acc't.

Did I overdraw my acc't? If so, when and how much? Hoping you will not find it too much to get the acc't so a leather-head can understand it. P. S. Sullivan wired $29,000 on release of mortgage St. Louis, to-day. Hoping it has all been released, satisfactorily, for I am paying him interest, and meant to stop interest at that end at once." On the 29th of June, Evans, defendant's secretary, applied to the Boatmen's Bank, and learning that Sullivan's letter of the same date, from San Antonio, had not been received by the bank—which of course it had not been, as it was only mailed at San Antonio that day—telegraphed Sullivan: "Your letter to Boatmen's Bank not received. Instruct them fully by mail at once." Evans called, later, at the bank and learned that Sullivan's letter had been received, but was not fully understood, so the bank would not pay the money without further directions. Thereupon, on the 1st of July, 1895, defendant telegraphed Chittim: "Sullivan's instructions to their bank are so indefinite that they can not pay us. Have Sullivan instruct them immediately and you wire us what to release to bank. Answer quickly." On the 1st of July 1895, Sullivan telegraphed defendant: "Present papers to Boatmen's Bank again. Instructions reached them by this time. Indorse Chittim's notes to us without recourse." On the same day defendant telegraphed Chittim: "Sullivan wants us to indorse your notes without recourse. We think your notes should be canceled before Sullivan gets them." Chittim telegraphed defendant, on the same day: "Sullivan wired bank to accept release of twenty-five hundred head of cattle in Thornton pasture. Deliver to bank, mortgage, release and notes covering them." On the 2d of July the Boatmen's Bank telegraphed Sullivan: "Strahorn-Hutton-Evans Co. offer release for twenty-five hundred with surrender of mortgage. Shall we accept? Please also state what amount of notes we are to get. They offer $30,000 canceled.

Decline to indorse without recourse and deliver uncanceled." On the 2d July, 1895, Sullivan telegraphed Boatmen's Bank: "Observe instructions our letter 29th and telegram 30th regarding payment of Strahorn-Hutton-Evans Com. Co. with exception that mortgage release and notes of J.M.Chittim shall cover twenty-five hundred head of cattle in Thornton pasture instead of forty-one hundred and fifty-six head as advised." This change from 4,156 to 2,500 head of cattle was made because while the mortgage covered 4,150 head there were only 2,500 head in the Thornton pasture, and Chittim explained to Sullivan that he, Chittim, owed defendant some other debt and defendant might not want to release all the security and as the 2,500 head of cattle was regarded as sufficient security to Sullivan, he agreed to make the change to 2,500 head from the 4,150 head as originally agreed upon as security for his loan to Chittim. Defendant still refused to indorse the notes without recourse, but insisted upon canceling them, and the Boatmen's Bank refused to pay the money unless the notes were indorsed without recourse. On the 3d of July defendant wired Chittim: "Please see Sullivan at once and make them fix matter." Chittim was not in San Antonio when this dispatch reached there, but Sullivan replied by wire to defendant: "Chittim out of the city, but if you will observe instructions wired you by Chittim yesterday you will get your money." Upon receipt of this telegram defendant wired Sullivan: "Why don't you instruct bank to accept release on twenty-five hundred steers and advise us how many of Chittim's notes you want. Please wire them immediately." On the same day defendant wrote Chittim: "Up to this hour, three o'clock, we have not been able to get the Boatmen's Bank to pay us the $29,000 which you advised us Sullivan & Co. instructed them to pay. When we went to see the Boatmen's Bank Monday they had not received any instructions from Sullivan & Co., except a telegram which was so indefinite that none of us could understand it. Tues-

day the Boatmen's Bank received a letter stating that we would turn over to them a released mortgage covering 4,156 cattle; later in the day they received a telegram stating to accept release on 2,500 head of cattle, and also instructed the Boatmen's Bank to require us to indorse your notes without recourse. Now, the question with the Boatmen's Bank is what notes to indorse and how many. We wired you yesterday, but Sullivan replies that your are out of the city, and that they can not do anything towards paying us the money until you return. *We know Sullivan very well, and firmly believe he has misinstructed his St. Louis bank here in order to make interest on your money. We sincerely hope for your own good and ours, too, that you will never have anything more to do with Sullivan when the business has to come through our hands, as we do not like his business methods, and we are afraid to deal with him.* We are now carrying all of your past due paper and are feeling the weight. Hope you will receive our telegrams to-day or to-morrow and we will make Sullivan & Co. instruct their St. Louis bank to pay us the money."

On the 5th of July the Boatmen's Bank paid defendant $29,000 and received from it Chittim's notes for $50,000 together with the mortgage securing the same and a release as to 2,500 head of cattle in favor of Sullivan & Co., which the bank forwarded to Sullivan & Co.

Sullivan & Co. had done business with the Boatmen's Bank for about fifteen years and had never received any interest on their account with the bank, had never overdrawn their account and at the times herein referred to had a balance to their credit in the bank of something over thirty-five thousand dollars. Sullivan & Co. and the defendant did not know each other at all, and had never had any previous business dealings with each other. When Chittim received defendant's letter, he showed it to Sullivan, and afterwards when Chittim spoke to Mr. Evans, the secretary of the defendant

company, about the letter, and told him he had shown the letter to Sullivan, Mr. Evans said the letter was intended for Sullivan to see if Chittim chose to show it to him.

Sullivan then instituted this libel suit against defendant, counting upon the italicised portion of the letter of July 3d, 1895. The defendant answered admitting the writing of the letter to Chittim, and pleaded that it was a privileged communication, written by it, in good faith, believing it to be true, to Chittim, its client and one of its stockholders. The reply was a general denial.

Upon the trial in the circuit court, the evidence for the plaintiff disclosed the facts herein set forth. At the close of the plaintiff's case the defendant demurred to the evidence on the grounds: "1st, Because under the pleadings and evidence in the case the plaintiff is not entitled to recover; 2d, Because the letter is privileged; 3d, Because the letter being privileged, there is no evidence of express malice offered." The court sustained the demurrer, plaintiff took a nonsuit with leave, which being overruled, the plaintiff appealed to this court.

## I.

In the trial court counsel treated the letter as libelous, the defendant contended that it was a privileged communication and the plaintiff, while conceding that the defendant had a right to write in harsh or fault-finding terms to Chittim about the business in hand, had abused its privilege by making irrelevant charges against the plaintiff and by libeling him, when there was no necessity in the nature of the business between defendant and Chittim to impute evil motives to Sullivan or to charge him with dishonesty or fraud, and hence the privilege was lost, and furthermore that there was enough *prima facie* evidence of express malice to take the case to the jury.

"A privileged communication," says Newell on Slander and Libel, (2 Ed.), p. 388, "is one made in good faith upon any subject-matter in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty, to a person having a corresponding interest or duty, and which contains matter which, without the occasion upon which it is made, would be defamatory and actionable." Every defamatory publication *prima facie* implies malice, but where a communication is made in good faith, upon any subject-matter in which the communicant has an interest or in reference to which he has a duty, legal, moral or social, to a person having a corresponding interest or duty, it is privileged, and the privilege rebuts the presumption of malice, and the burden of proof is cast upon the plaintiff to prove express malice.    [Newell on Slander and Libel (2 Ed.), pp. 389 to 391.]    But the interest must be common to both parties, the person communicating and the recipient of the communication, e. g., two customers of the same bank, two directors of the same company, two creditors of the same debtor, two officers of the same corps, two executors or trustees, an attorney and client, etc.; and to fall within the privilege "the statement must be such as the occasion warrants, and must be made *bona fide* to protect the private interests both of the speaker and of the person addressed."    [Odgers on Libel and Slander (1 Am. Ed.), star p. 234.]    "So, too, in making a communication which is only privileged by reason of its being made to a person interested in the subject-matter thereof, the defendant must be careful not to branch out into extraneous matters with which such person is unconcerned.    The privilege only extends to that portion of the communication in respect of which the parties have a common interest or duty. The defendant must also be careful to avoid the use of exaggerated expressions; for the privilege may be lost by the use of violent language when it is clearly uncalled for."    [Odgers on Libel and Slander, (1 Am. Ed.), star p. 239.]    Or as

was said in Callahan v. Ingram, 122 Mo. l. c. 365, where a member of a city council, while in open session, spoke of the superintendent of streets, against whom no charge or injury was pending, as a "downright thief," and when sued for slander, defended on the ground of privileged communication: "There can be no doubt, on proper occasion, members of the city council would be protected from 'responsibility for whatever is said by them which is pertinent to any inquiry or investigation pending or proposed before them,' but no further; they would become 'accountable when they wander from the subject in hand to assail others.'"

In Tuson v. Evans, 12 A. & E. 733, it appeared that defendant claimed that plaintiff owed him rent, and authorized his agent to demand it. The agent reported to defendant that plaintiff denied his liability, and thereupon defendant wrote to his agent saying: "This attempt to defraud me of the produce of the land is as mean as it is dishonest." Plaintiff sued for libel. Defendant pleaded privileged communication. The trial judge reserved leave to move to enter a nonsuit, but told the jury that the publication was a libel, and that the only question was the amount of the damages. There was a verdict for plaintiff and upon the decision of the rule reserved, Lord DENMAN, C. J., said: "Some remark from the defendant on the refusal to pay the rent was perfectly justifiable, because his entire silence might have been construed into an acquiescence in that refusal, and so might have prejudiced his case upon any future claim; and the defendant would, therefore, have been privileged in denying the truth of the plaintiff's statement. But, upon consideration, we are of opinion that the learned judge was quite right in considering the language actually used as not justified by the occasion. Any one, in the transaction of business with another, has a right to use language bona fide, which is relevant to that business, and which a due regard to his own interest makes necessary, even if it should directly, or by its consequences,

be injurious or painful to another; and this is the principle on which privileged communication rests; but defamatory comments on the motives or conduct of the party with whom he is dealing do not fall within that rule.   It was enough for the defendant's interest, in the present case, to deny the truth of the plaintiff's assertion; to characterize that assertion as an attempt to defraud, and as mean and dishonest, was wholly unnecessary.   This case, therefore, was properly left to the jury; and there will be no rule."

Applying these principles to the case at bar it follows that the trial court erred in holding that the portion of the letter of July 3d, complained of was privileged.   The occasion did not justify the terms employed and they were wholly unnecessary, and this is true even if it be conceded that they were used in respect of a matter of common interest between defendant and Chittim, as to which it is quite debatable.

The record shows that defendant was advised by plaintiff as early as June 24th that Chittim had secured the money from him to pay defendant if the securities were proper, and defendant was requested to send the securities to plaintiff at San Antonio, and also to send Chittim's stock in the defendant company to plaintiff.   Defendant, on the 26th day of June, sent the stock to plaintiff and wrote him that the Chittim notes were held by defendant's Kansas City office and that plaintiff would hear from there by due course of mail.   But instead of doing so, for some unexplained reason, defendant, two days later, June 28th, telegraphed Chittim to have Sullivan wire his St. Louis bank to pay it $29,000, on receipt of mortgage, *released to Sullivan & Co. covering forty-one hundred and fifty cattle* in the Thornton pasture, stating that this would make Chittim's individual account about even at the defendant's St. Louis office.   Complying with this request for a change of the original arrangement, Sullivan, on the next day, July 29th, wired defendant that he had written the Boatmen's Bank to pay it $29,000 on delivery to them of

proper releases of Chittim cattle, and did actually write the Boatmen's Bank directing it to pay defendant $29,000 upon delivery to it of mortgage, releases and notes of Chittim, "covering said mortgage" on 4,156 head of cattle in the Thornton pasture. On the 1st of July defendant's secretary called on the bank and was informed that Sullivan's instructions were so indefinite and uncertain the money could not be paid, and defendant so wired Chittim and asked him to have Sullivan instruct the bank immediately, and asking what Chittim wanted released to the bank. On the same day Sullivan telegraphed defendant to present the papers to the bank again, and added: "Indorse Chittim's notes to us without recourse." Instead of doing this, defendant, on the same day telegraphed Chittim that Sullivan wanted the notes indorsed to him without recourse, and advised Chittim that the "notes should be canceled before Sullivan gets them." On the same day Chittim telegraphed defendant that Sullivan had instructed the bank to accept release of 2,500 cattle in the Thornton pasture, and directed defendant to deliver to the bank "mortgage, release and notes covering them." Up to this time 4,150 head of cattle had been spoken of, and this is the first time a release of 2,500 head had been referred to in the correspondence, and this reduction was not of defendant's asking but was suggested to Sullivan by Chittim and agreed to by him, so that defendant would still have security for any other debt Chittim owed it, although in its telegram to Chittim of June 28th, asking that the payment be made in St. Louis instead of in San Antonio, defendant had said the mortgage had covered 4,150 head of cattle and that $29,000 would make Chittim's individual account about even at the St. Louis office. However, instead of doing as Chittim directed on the 1st of July, the defendant, on the 2d of July, offered the Boatmen's Bank to release 2,500 head of cattle with surrender of mortgage and of Chittim's notes for $30,000 canceled, and declined to deliver to the bank the Chittim notes

indorsed without recourse as directed by Sullivan's telegram of the 1st of July, but insisted upon canceling the notes, as defendant advised Chittim, by telegraph, on the 1st, to do. Right here it will be observed that defendant was itself the cause of the money not being paid on that day, because it knew that Sullivan had furnished Chittim the money to pay his debt to defendant and was to get the securities it held, and the whole negotiation up to this time was on that understanding, yet defendant arbitrarily and without any authority from Chittim, but in the face of his instructions to the contrary and of his refusal to take its advice to cancel the notes before Sullivan got them, refused to indorse the notes without recourse and insisted upon canceling the notes. Upon being advised by the bank of this claim of defendant, Sullivan directed the bank to observe his instructions previously given. Thereupon on the 3d of July defendant, without disclosing the true reason for the nonpayment, telegraphed Chittim to have Sullivan fix the matter, and upon receiving a reply from Sullivan that Chittim was out of the city but that if it would observe Chittim's instructions of the 2d of July it would get its money, telegraphed Sullivan on the same day (July 3d) to instruct the bank to accept release on 2,500 head of steers and asking how many of Chittim's notes he wanted. This, too, in the face of Chittim's telegram to it on July 1st telling it that Sullivan had instructed the bank to accept a release of 2,500 cattle upon his delivering to the bank "mortgage, release and notes covering them." It is incomprehensible how defendant could ask Sullivan how many of Chittims's notes he wanted, when it knew Sullivan was furnishing the money to pay the $29,000 Chittim owed defendant and was to get the mortgage and all the notes it covered. It will be observed, however, that defendant did not tell Sullivan the true reason upon which the bank refused to pay him the money on the day before, i. e., that defendant would not indorse the notes without recourse but insisted upon canceling them before Sullivan got

them.   Thus it appears that the defendant itself was wholly and solely the cause of the $29,000 not being paid to it before the 3d of July.   Sullivan and Chittim and the bank had met every proper request of defendant, and defendant itself refused to accept the money on the 2d of July except upon terms it was not authorized to impose and which were perfectly absurd, to wit, that the notes, which were to be Sullivan's security, should be canceled before he received them. Now, it was in the light  of these facts, conditions and circumstances, that the defendant wrote the letter of July 3d to Chittim, containing the libelous matter complained of in this suit.   That matter was unnecessary and unjustifiable.   It said:   "We wired you yesterday, but Sullivan replies that you are out of the city, and that they can not do anything towards paying us the money until you return."   Sullivan's telegram was quite different.   It read:   "Chittim out of the city, but if you will observe instructions wired you by Chittim yesterday you will get your money."   Again this letter said: "We know Sullivan very well" (which was not a fact, as defendant and Sullivan were not acquainted and never had any dealings before) "and firmly believe that he has misinstructed his St. Louis bank here in order to  make  interest on  your money" (which was a gratuitous imputation of improper and evil motives to plaintiff, wholly unwarranted in view of the fact that defendant was informed by plaintiff's telegram of June 29, that the bank was instructed to pay it $29,000 on delivery to it by the defendant of proper releases of the Chittim cattle).   Again the letter proceeded:   "We sincerely hope for your own good and ours, too, that you will never have anything more to do with Sullivan when the business has to come through our hands, as we know his business methods, and we are afraid to deal with him," which; as Lord DENMAN said in Tuson v. Evans, *supra,* was a "defamatory comment on the motives and conduct" of Sullivan, for which there was no provocation or foundation of fact in anything Sullivan did

in this transaction or as shown by the record in this case had ever done. On the 5th of July defendant indorsed the notes covered by the deed of trust without recourse, and delivered the mortgage, release of 2,500 cattle and the notes to the bank and received from it $29,000, just as it might have done at any time after June 29, and certainly at any time after July 2d. If it had done so there never would have been any occasion as there never was any excuse for the letter of July 3d, complained of in this case.

Thus it conclusively appears not only that the language complained of was libelous, and was not privileged, but also that the violence of the language used and the improper and evil motives and conduct attributed to Sullivan afforded sufficient *prima facie* evidence of actionable malice to take the case to the jury. It was a question of law for the court whether the letter was a privileged communication but malice was a question of fact for the jury, if there was any evidence whatever of malice. [Newell on Slander and Libel (2 Ed.), p. 392, secs. 10; Arnold v. Jewett, 125 Mo. 241.]

These conclusions result in reversing and remanding this case. It is so ordered. All concur.