C. M. GUSTAFSON

v.

GENERAL MOTORS ACCEPTANCE
CORP.

Civ. No. 71-26C.

United States District Court,
D. South Dakota.

Jan. 26, 1972.

Charles Rick Johnson, Gregory, S. D., for plaintiff.

John B. Wehde, Huron, S. D., for defendant.

## MEMORANDUM DECISION

BOGUE, District Judge.

Colonel Gustafson had been in the business of selling automobiles since the late 1940's. In 1962 Gustafson bought an automobile dealership, Colonel Motors, Inc., in Pierre, South Dakota. From the early 1950's until 1969 Gustafson had financed his automobile business primarily through the General Motors Acceptance Corporation (hereinafter known as GMAC).

According to Gustafson's agreement with GMAC, the financing of Gustafson's wholesale purchases of new autos and the discounting of retail contracts on both new and used autos sold by the dealership, would be handled by GMAC. During Gustafson's last year of operation the Pierre dealership grossed approximately $1,750,000.00.

Because the plaintiff felt he had a rather restrictive financing arrangement with GMAC, Gustafson informed GMAC in April of 1968 that he would search elsewhere for a line of credit to finance his business. Gustafson then began exploring the possibility of financing his dealership through the Pierre National Bank.

On the morning of June 24, 1969, the regional GMAC office in Huron, South Dakota, received word that a check to GMAC from Colonel Gustafson in the amount of $1,824.66 had been dishonored at the bank. Mr. Clayton Ustrud, the manager of the General Motors Acceptance Corporation's branch office in Huron, South Dakota, then left the Huron office and drove to Pierre, South Dakota, arriving shortly before noon.

After a cursory examination of Gustafson's auto lot and an abbreviated inventory conducted by Richard McCann and Mr. Ustrud, Mr. Ustrud told Gustafson that he was indebted to GMAC in excess of $41,000.00. Gustafson said that this was impossible. He stated that he may have been indebted at that moment approximately $10,000.00 but that he could pay GMAC immediately the $10,000.00. On similar inventories over the years Gustafson had been indebted by as much as $18,000.00, but he always paid off the amount immediately. It was primarily a matter of bookkeeping.

Ignoring the fact that GMAC owed Gustafson an amount in excess of $15,000.00, a telegram was sent at 10:55 that morning to General Motors cancelling Gustafson's credit immediately. Ustrud and McCann then went to the Pierre National Bank where they confronted Mr. Walter Burke and Mr. William Fischer, local bank officers. Mr. Burke and Mr. Fischer were told by the GMAC employees that Colonel Gustafson was $41,000.00 "out of trust". They also inferred to the bank employees that Gustafson had a silent partner who was getting money out of the business and that the bank should immediately inventory plaintiff's used car lot which was financed by the bank. GMAC then stopped payment on the checks owed to Gustafson. By terminating Gustafson's credit with General Motors, GMAC halted the transit of new cars that Gustafson had already sold. These actions by GMAC stopped the flow of capital into Gustafson's business rendering him unable to pay his bills. Gustafson attempted to borrow $10,000 from the Pierre National Bank as he had done on numerous occasions. The bank turned down the request stating that until the bank knew more about the situation with GMAC, the bank would not loan Gustafson any more money.

After a few days Gustafson secured a $10,000.00 loan from the Pierre National Bank. But he had to promise the bank

that he would sell his business within 90 days so that the bank would be absolutely assured that it would get its money back. All debts to GMAC were settled by the payment of approximately $9,000.00 from Gustafson to GMAC. The dealership was sold within 90 days for $50,000.00, which is approximately what Gustafson paid for the dealership in 1962.

Plaintiff then started a used car business which failed. He currently is in the business of operating two taco establishments.

Gustafson subsequently brought the current lawsuit alleging that GMAC slandered him and caused him to lose his business and caused damage to his reputation.

According to South Dakota Compiled Laws 20–11–4 (1967), "Slander is a false and unprivileged publication, other than libel, which:

(3) Tends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit.

(5) By natural consequence, causes actual damage."

The statement by Mr. Ustrud to certain officers of the Pierre National Bank that Gustafson was $41,000.00 "out of trust" was a false statement. Gustafson did not owe GMAC $41,000.00, and he was not out of trust. In fact, GMAC owed Gustafson approximately $15,000.00. A few days after the inventory, Gustafson paid off all debts owing to GMAC with a check for approximately $9,000.00. Also, from the testimony of the plaintiff and defendant's employees, Gustafson had on other occasions been in arrears in his payments to GMAC when an inventory was made. But in the past it was always acceptable to both parties if Gustafson would write a check for the indebtedness. His indebtedness was always covered within a few days by payments owing to Gustafson from GMAC and Gustafson's customers. It was primarily a matter of faulty bookkeeping.

When Mr. Ustrud stated that Gustafson was $41,000 "out of trust" there was an imputation of dishonesty on the part of Gustafson. To be considered a malicious statement, it is not essential that a statement be motivated by personal spite. Malice may also be shown by a wanton disregard of the rights and interests of the party injured. Vojak v. Jensen, Iowa, 161 N.W. 2d 100 (1968). By making only a cursory inventory and then going to one of plaintiff's sources of credit, defendant displayed a wanton disregard of the true situation and of the interests of the plaintiff. The inspection of plaintiff's financial obligations was summarily handled in a capricious manner.

According to defendant's U. S. Branch Operations Manual § 800–12 which was received into evidence by the Court as Plaintiff's exhibit 31, defendant had a very meticulous procedure which its employees were to follow when they received a check from an auto dealer marked insufficient funds. The manual called for, among other things, a complete wholesale inventory. Defendant's abbreviated inventory could not be called complete or correct.

Defendant, GMAC, did not display the requisite good faith. Diplomat Electronic, Inc., v. Westinghouse Electric Supply Company, 430 F.2d 38 (5th Cir. 1970). Defendant's ill-will is further illustrated by the fact that it sent a telegram to General Motors cancelling plaintiff's line of credit before even the briefest of inventories could be completed. The Court must look to the surrounding circumstances to ferret out the intent and motives of the defendant in his publication. Martin v. Outboard Marine Corp., 15 Wis.2d 452, 113 N.W. 2d 135 (1962); Springer v. Swift, 59 S. D. 208, 239 N.W. 171 (1931); Turner v.

Brien, 184 Iowa 320, 167 N.W. 584 (1918); Bolton v. Walker, 197 Mich. 699, 164 N.W. 420 (1917). Considering the time, place, and circumstances attending the alleged slanderous words, the Court finds that the publication was not prompted by good will and was, in fact, malicious.

██ The Court is aware of the fact that the proof of mere negligence is insufficient as a basis for determining the existence of slanderous remarks. Williams v. Hobbs, 81 S.D. 79, 131 N.W.2d 85 (1964). But the curt and capricious manner in which the inventory was taken leads one to the inescapable conclusion that defendant's actions were more blameworthy than mere negligence. The actions constituted a wanton disregard of the truth.

 The defendant argues that its publication is privileged. In determining whether the communication is privileged, the Court must look at the nature of the subject, the interests of the parties, the time, place and circumstances of the occasion, and the nature, character and extent of the communication. Southwest Drug Stores of Mississippi, Inc., v. Garner, Miss., 195 So.2d 837 (1967). Good faith must permeate the communication to give it privileged status. Viewing the circumstances surrounding the publication, the Court finds ill will and bad faith on the part of the GMAC employees. Although a creditor may complain to another creditor that a debtor is slow in making payments, he has no right to impute dishonesty or other evil motive to the debtor. Sullivan v. Strathan-Hutton-Evans Com. Co., 152 Mo. 268, 53 S.W. 912 (1899). Therefore, defendant's publication was not privileged, but rather, defamatory.

██ In determining damages, the Court will assess the damages that are the natural, proximate and necessary result of the defamation, Meyerle v. Pioneer Pub. Co., 45 N.D. 568, 178 N.W. 792 (1920). It is the uncontroverted testimony that as a result of the defamatory remarks the plaintiff had to sell his business in a restrictive period of time, causing him to lose approximately $25,000.00. The Court will also consider that plaintiff was 56 years old when he was forced to sell Colonel Motors. His testimony was that he planned to operate the business until he was 70 years old, which would be 14 years. This is in contrast to the plaintiff's life expectancy which is 18.97 years. (Commissioners 1958 Standard Mortality Tables.) Plaintiff was earning $17,500 per year when he was forced out of business (he collected approximately $12,000 directly in wages, while approximately $5,500 went toward reducing his debt to Motors Holding Corporation, an investor in the Colonel Motors Corporation). Plaintiff is presently operating two taco establishments with the help of his wife and four daughters. His approximate income from these ventures is $6,000 per year. Bearing in mind that the plaintiff owned 83% of Colonel Motors' stock and would have owned all of the stock by 1973 or 1974, a reasonable and conservative estimate of his loss of business earnings resulting from the slanderous remarks is $11,500 per year for the fourteen years. The business losses should have been reasonably anticipated from the slanderous publication. The remarks of the defendant's employees were the impetus for halting plaintiff's credit and causing him to lose his automobile dealership.

The Court has taken into consideration plaintiff's financial condition both preceding and subsequent to the slanderous remarks by defendant's employees. Plaintiff has suffered a definite loss because of the statements. It is also reasonably certain that the plaintiff will not in the future approach the earnings that he was receiving before the slanderous communication. Because of the business losses suffered when the plaintiff was forced to sell his business and those business losses that he is reasonably expected to incur in the future, this Court finds for the plaintiff and against

the defendant in the amount of $186,000.00.

The foregoing Memorandum Opinion shall constitute this Court's findings of fact and conclusions of law.