# R. A. HOLMES v. ROYAL FRATERNAL UNION, Appellant.

### Division Two, July 13, 1909.

1. **LIBEL: Privileged Communication.** If the words complained of were written by defendant in the discharge of some duty, public or private, legal or moral, or with the view of protecting some interest pertaining to defendant's business, and were relevant and proper in that connection, and were made in good faith upon· a proper occasion, with a proper motive based upon a probable cause, and in the honest belief that they were true, they are a privileged communication.

2. ———: ———: **Fraternal Society to Agent.** Plaintiff was the agent of defendant fraternal˰beneficiary association, and demanded larger compensation than defendant considered him entitled to under his contract, and held back moneys collected by him which defendant and his contract required him to remit, and had in some of his letters threatened suit against defendant if it did not accede to his terms, and avowed that if it did not accede he would leave defendant's employ and that when he left he would take two-thirds of defendant's members with him. Thereupon, after an attempt to amicably adjust the matters with plaintiff, without success, defendant wrote its members in the community where he was agent that plaintiff had been discharged, that he had collected the dues due from members for two months and reported the amounts collected and the names of members who had paid, but had remitted none of the moneys collected by him, and notifying the members that they would not lose standing in the association, and asking them to remain. The evidence strongly tends to prove those assertions to be true. *Held*, that the letter was a qualified privileged communication, and in the absence of a showing by plaintiff of some sort of express malice the court should have sustained defendant's demurrer to the evidence.

3. ———: ———: **Malice.** Where the letter was a qualified privileged communication, it is essential that plaintiff show that the exigencies of the situation did not call for the use of the language employed, and that it amounts to an abuse of the privilege,. and was therefore actuated by express or actual malice. A privileged communication is an exception to the rule that every defamatory publication implies malice.

4. ———: ———: ———: **Burden.** It is the duty of the court to
determine whether or not the communication is a privileged
one, and if it is privileged the burden ' shifts to plaintiff to
show malice, and if there is no substantial evidence of ex-
press or actual malice then the court should sustain a de-
murrer to' plaintiff's case.

5. ———: ———: **Untrue Statement.** A statement made by a
fraternal association to its members that plaintiff, its agent,
had not remitted the moneys he had collected for two months,
when in fact he had retained all those collected for one month
and a part of those collected the previous month, was sub-
stantially true.

Appeal from Buchanan Circuit Court.—*Hon. C. A.
Mosman,* Judge.

REVERSED.

*Edwin S. Puller* and *Rusk & Stringfellow* for
appellant.

(1) The communication was privileged. Cooley
on Torts, p. 211; Finley v. Steele, 159 Mo. 299; Over-
ton v. White, 117 Mo. App. 604; Byam v. Collins, 111
N. Y. 143; 25 Cyc. 385; 1 Jaggard on Torts, 539; 18
Am. and Eng. Ency. Law, 1029, 1037; Kirkpatrick v.
Eagle Lodge, 26 Kan. 384; Streety v. Wood, 15 Barb.
(N. Y.) 105; Ginsberg v. Union Surety & Guaranty
Co., 74 N. Y. Supp. 561, 68 App. Div. 141; Nichols v.
Eaton, 81 N. W. 792; Montgomery v. Knox, 23 Fla.
595; Lally v. Emery, 59 Hun 237, 12 N. Y. Supp. 785;
Galligan v. Kelly, 31 N. Y. Supp. 561; McKnight v.
Hasbrouck, 17 R. I. 70; Pearce v. Browner, 72 Ga. 243;
Branaman v. Hinkle, 137 Ind. 496; Wieman v. Mabee,
45 Mich. 484; Harwood v. Keech, 4 Hun 389; Rousch
v. Anderson, 75 Ill. App. 526; Henry v. Moberly, 51
N. E. 497; Gattis v. Kilgo, 140 N. C. 106; Barrows v.
Bell, 7 Gray 301; Sheftall v. Railroad, 123 Ga. 589;
Noonan v. Orton, 32 Wis. 106; Allen v. Railroad, 100
N. C. 397; Chambers v. Leiser (Wash.), 86 Pac. 627;
McCarty v. Lambley, 46 N. Y. Supp. 792. (2) There

was no evidence of express malice. A case of qualified privilege should not be submitted to the jury without evidence of express malice. Finley v. Steele, 159 Mo. 306; Allen v. Railroad, 100 N. C. 397; Redgate v. Rousch, 61 Kan. 480; Kirkpatrick v. Eagle Lodge, 26 Kan. 384; Bee Pub. Co. v. World Pub. Co., 59 Neb. 713; White v. Nichols, 3 How. (U. S.) 266; Erber v. Dun, 12 Fed. 526; Locke v. Bradstreet Co., 22 Fed. 771; 18 Am. and Eng. Ency. Law, 1029; 25 Cyc. 412, cases note 21; 32 Century Digest, 2070, secs. 149, 150. (3) The facts stated in the letter were true, in substance and effect. St. Louis Clo. Co. v. Dry Goods Co., 156 Mo. 403; Boogher v. Knapp, 97 Mo. 122; Edwards v. Knapp, 97 Mo. 432; Matt v. Dawson, 46 Iowa 533; Ropke v. Brooklyn Daily Eagle, 9 N. Y. 709.

*J. W. Sullinger* and *Thompson & Thompson* for respondent.

This case was properly submitted to the jury, and the instruction in the nature of a demurrer, submitted to the court by defendant, at the close of all the testimony, was properly overruled by the court, for the reason that where a person is charged in a publication with want of integrity and honest dealings in his business relations, the words thus published are libelous *per se*. Rammell v. Otis, 60 Mo. 365; Noeninger v. Vogt, 88 Mo. 589; Baldwin v. Walser, 41 Mo. App. 243; Spenlock v. Lambard Ins. Co., 59 Mo. App. 225; St. James Military Academy v. Gaiser, 125 Mo. 517. A publication which will be protected by the rule of privilege is one, made on a proper occasion, from a proper motive, based upon a probable cause, and in a proper manner. Wallace v. Jameson, 179 Pa. St. 116; Conway v. Pittsburg Times, 139 Pa. St. 334; Sullivan v. Commission Co., 152 Mo. 277. But if such publication is not so made the privilege will be lost. Wallace v. Jameson, 179 Pa. St. 116; Conway v. Pitts-

burg Times, 139 Pa. St. 334; Neeb v. Hope, 111 Pa. St. 152; Callahan v. Ingram, 122 Mo. 365; Sullivan v. Commission Co., 152 Mo. 277; Wagner v. Scott, 164 Mo. 303. A publication which is protected by the rule of privilege is an exception to the general rule that "every defamatory publication prima facie implies malice." Denver Public Warehouse Co. v. Holloway, 83 Pac. 131. To give to the words complained of the character of a qualified privilege, it must appear that they were written by defendant association in the discharge of some duty, public or private, legal or moral, and with that end and purpose in view, or in the conduct of some matter involving its interest, and that they were written for the protection of that interest, and that they were relevant and proper in that connection. It must also appear that they were uttered in good faith, made on a proper occasion, from a proper motive, based upon a probable cause and in the honest belief that such statements were true. Quinn v. Scott, 22 Minn. 462; Swan v. Tappan, 5 Cush. 104; Gassett v. Gilbert, 6 Gray 94; Klinck v. Colby, 46 N. Y. 427; Wallace v. Jameson, 179 Pa. St. 116; Sullivan v. Commission Co., 152 Mo. 277.

FOX, J.—This cause is here by appeal from a judgment of the Buchanan County Circuit Court, in favor of the plaintiff.

This is an action for libel and is based upon a letter written by the appellant at St. Louis, Missouri, addressed to one Clint Hull at St. Joseph, Missouri, dated December 22, 1904, containing as alleged in the petition, several false, scandalous, malicious and defamatory matters of and concerning the respondent in his business. It is also alleged in the petition that appellant on the same date wrote and mailed the same letter to a number of other persons at St. Joseph, Missouri, containing, as alleged, the same libelous matter. The petition charges libel in the usual form, based

upon the publication of said letter by the parties therein named opening and reading same.

The answer of appellant admitted that the letter charged was written and mailed to Clint Hull, as well as other members of the Royal Fraternal Union at St. Joseph, and alleges that it was not mailed to any one else or otherwise published. It is denied that the letter was libelous and the innuendoes of the petition are denied. In defense, the truth of the letter is pleaded, and appellant further pleaded that it was a privileged communication. Appellant alleged its good faith in writing and publishing the letter.

The appellant is a fraternal beneficiary association incorporated under the laws of this State, with headquarters at St. Louis. Holmes was a member of the association, and for two years prior to the publication of the alleged libelous letter was employed by the association in soliciting members, organizing subordinate councils and taking applications for beneficiary certificates or policies.

The letter written by the association to Clint Hull, C. B. Peasley and others, at St. Joseph, Missouri, of and concerning respondent as its agent, dated December 22, 1904, is as follows:

"Dear Sir and Brother: You are hereby notified that we have canceled the authority of our former representative at St. Joe, Mo., Mr. R. A. Holmes, to represent this order in any manner whatever. He is not authorized to take applications or to collect or to receipt for dues. Mr. Holmes has not remitted to this office any of the collections that he has made at St. Joe for the last two months; while he has reported to us the names and amounts collected he has failed to remit the money he has collected, due the order, so you are advised not to make any more payment of dues to Mr. Holmes, as he has no authority to collect dues or receipt for payments made to him. As we had advised you to make your payments to Mr. Holmes, we

have credited you and the other members at St. Joe, with all the payments they made to him and stood the loss ourselves.

"We have arranged with the firm of Hull & Chittenden, at No. 610 Edmond street, St. Joe, Mo., to take care of the collections until some other arrangements can be made. They have the collection list in their office and are authorized to receipt for monthly dues. If it is more convenient for you to remit your dues direct to the home office than to pay to them you are at liberty to do so, but in either event the payment must be made on or before the last day of the month. Please call at their office and make your payment to them at your earliest convenience. Kindly keep in mind that it will be necessary for you to go to the office of the above firm (Hull & Chittenden) to make your payments—they will not send a collector to your home. We regret exceedingly that it has become necessary to cancel Mr. Holmes' authority and we hope you and the other members at St. Joe will appreciate the situation and retain your membership in the order. We will endeavor to secure an active agent at St. Joe as soon as possible.

"With best wishes, I remain,
"Fraternally yours,
"F. H. PICKRELL, President."

In December, 1902, respondent was employed by the association by a written contract to act as its agent, with territory in the State of Kansas. Under the provisions of this contract he was to receive as full commission for all services rendered, all the first payments collected at the time of taking applications, and in addition thereto the third, fifth, seventh, tenth and twelfth assessment received at the home office on business written by Holmes, or agents appointed by

him. Respondent soon became dissatisfied with 'the commissions received under this contract, when the association offered him another which was rejected. Again in July, 1903, the association undertook to satisfy him by a new contract and invited him to come to St. Louis, the association agreeing to pay one-half the expenses; this was also rejected, and at the same time, respondent, in a letter to the association, threatened suit if matters were not adjusted to his satisfaction. On November 2, 1903, a new contract was entered into between respondent and the association. This new contract covered nine counties in the State of Kansas and four counties in Northwest Missouri, including St. Joseph. The powers given by the new contract to respondent were similar to those embraced in the first contract, but set out more in detail. Under this new contract respondent, for all services rendered by him, or any sub-agent he might appoint, was to receive upon the health and accident business all the policy fee collected by the agents, forty per cent of the first twelve monthly dues, and twenty per cent of subsequent monthly dues, as well as some contingent commissions which are not necessary to be noticed in this statement. The dues on policies under this last contract were to be remitted monthly by respondent to the association on or before the third day of the month to which the dues applied. The association was to report and remit to respondent his commissions on the 25th of the same month. The new contract superseded the old contract. The respondent, after entering into the new contract, was still entitled under the old to commissions on dues paid by members obtained during its life, up to and including the twelfth monthly payments. The alternate payments to which respondent was entitled under the old contract, were called "skip" payments, and one of his contentions with the association was that he was to receive these "skip" payments after the end of the first year. This con-

tention was found by the circuit court to be in the face of the contract, and it so instructed the jury.   Under the first contract the association revised and sent to respondent a monthly list showing new members and old members who had defaulted.   This list was to be returned by him, and was returned until he finally kept it, as he wrote the association, for the purpose of placing it in the hands of his attorney.

Respondent also claimed that in addition to the commission provided in each, the first and second contracts, he was further entitled to ten per cent for collecting.   In the early part of 1904 he began to retain ten per cent in addition to the forty per cent allowed under the contract, on all collections.   This act the association demurred to and wrote him that he was not entitled to the extra ten per cent, but he continued to deduct it from his collections, and also deducted at least one "skip" payment to which he was not entitled.   The last remittance made by respondent of his collections to the association was in November, 1904. From that remittance he not only deducted forty per cent under the contract, but deducted thirty. per cent as well, claiming that there was ten per. cent due him for the months of September, October and November. The association complained of this extra deduction and undertook to point out to respondent that he was not entitled to it, he maintaining that he was.   Respondent also made collections for December amounting   to $64.89, none of which was remitted to the association. He took the stand that he was entitled to the money in his hands, and that he did not propose to remit any more until the association recognized his claim. Respondent testified that the association owed   him $125 or $150, but he did not make any showing in detail as to how the association owed him any such amount.   His claim for ten per cent extra commission was also determined against him by the circuit court by an instruction to that effect.

The evidence demonstrates clearly that respondent failed to remit to the association a great portion of the collections for November made at St. Joseph, and all the collections made at the same place for the month of December. The association's book in evidence disclosed that he was indebted to it in the sum of $127.99, and while respondent testified that the association was indebted to him in about that sum, yet his testimony was a mere assertion and is not based upon any tangible figures or facts. The association wrote him a number of letters relative to the November and December collections, all of which are couched in courteous and reasonable language, requesting him to remit the amounts he had collected. On November 11th, the association wrote him and gave notice, under the terms of the second contract, of its cancellation, to be effective ten days from date. On the 14th day of November, the association again wrote him, urging him to make settlement under the terms of his contract, making it clear that the observance of its terms would be required, and also proposing to negotiate a new contract with him. Respondent did not write the association again until he reported his collections for December, when he reported the sum of $64.89, and retained the whole amount. He again claimed ten per cent extra commission, and intimated plainly in this last letter that he was holding the money then in his hands until his demands were acceded to by the association. The association then had a complete examination made of all the business of respondent, allowing him commissions he was entitled to under both contracts, and found that he was indebted in the sum of $127.99 to the association. The supreme president of the order then ordered Mr. Chittenden, one of the clerks in the office in St. Louis, to notify respondent of the termination of his contract and cancellation of his authority, and to notify members at St. Joseph who had been paying dues to him, not to make any further

payments to him. Accordingly, Chittenden notified respondent of the cancellation of his contract, and on December 22, 1904, the letter, which is the basis of this action, was written and mailed to the members of the association at St. Joseph. Prior to this, in a number of letters, respondent had threatened suit against the association, and had also threatened that if the association did not accede to his demands for further commissions, he would leave the order and take two-thirds of the St. Joseph members with him.

This sufficiently indicates the nature and character of the testimony upon which this cause was submitted to the jury.

At the close of the evidence the court instructed the jury in accordance with its views, upon the facts as developed upon the trial, and the cause being submitted to them they returned their verdict, finding the issues for the plaintiff and assessing his damages at the sum of five thousand dollars. Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Judgment was entered in accordance with the finding of the jury, and from this judgment defendant prosecuted its appeal, and the record is now before us for consideration.

## OPINION.

The record discloses that during the progress of the trial the defendant preserved numerous exceptions to the action of the court in the admission and rejection of testimony, as well as to the refusal and giving of instructions.

The legal propositions confronting us, which are disclosed by the record, may thus be briefly stated:

First. Was the letter upon which this action is predicated, and which is fully indicated in the statement of this cause, upon the trial, a qualified privileged communication?

Second. If said letter was a qualified privileged communication, then should the circuit court have so declared as a matter of law, or should the questions of privilege and malice have been submitted to the jury?

Third. Were the statements as made in the letter substantially true, as shown by a large preponderance of the evidence?

## I.

Manifestly the circuit court reached the conclusion from an inspection of the letter, which forms the basis of this suit, in conjunction with testimony offered, that it was not a privileged communication, either qualified or otherwise; hence, the court refused to submit to the jury the question of privilege, or the facts constituting a privileged communication, as well as the question of express malice.

Upon the disclosures of the record the first insistence of appellant is that the letter was a privileged communication, and that the evidence absolutely fails to show any express malice; hence it was the duty of the court to sustain the demurrer to the evidence. Upon this insistence the first question which confronts us is as to whether or not the letter in question was a privileged communication, and if so whether or not it was the duty of the trial court, as a question of law in the first instance, to so determine.

In order to intelligently discuss this proposition it is necessary to briefly refer to the facts as developed upon the trial. The testimony discloses that Holmes had been the agent of appellant for the purpose of soliciting business, taking applications and establishing agencies, for the space of about two years before their business relations came to an end by the writing of the letter in question. The correspondence introduced by both parties, much of which on the part of appellant was excluded, and improperly so if the said letter is to be treated as a qualified privileged com-

munication, shows that shortly after respondent began working for appellant he became dissatisfied and fault-finding, and wrote to it claiming more commissions than were allowed by his contract. The letters of appellant show that it was at all times very patient with and courteous to the plaintiff, manifested a desire to please him and come to an amicable understanding. The second contract entered into was more liberal in its terms than the first; and other contracts were offered by appellant to respondent, which he rejected. No letter written by appellant to respondent prior to the one in question was in the least exceptional. Prior to the writing of that letter respondent had threatened to put claims in the hands of his attorney and to bring suit against the association, and had also threatened that if he left the employ of appellant he would take two-thirds of its members at St. Joseph with him. His contracts required him to collect and remit every month the dues for that month, and on or before the third day. A remittance was made by him for November, 1904, but no remittance was made for December of the same year, although he reported that for December he had collected something over sixty-four dollars. He retained that money and stated that he would not send it to the association until a settlement was reached. Even after this information came to appellant from respondent it endeavored to adjust matters with him and offered him a new contract. Then the president of appellant put on foot a careful investigation and had the books of the association examined, in order to determine the standing of the account between it and the respondent. The testimony tends strongly to show that respondent was then indebted to appellant in the sum of $127.99. The letter in question was then written by the clerk in the St. Louis office of appellant at the instigation of its president, to members of the order at St. Joseph. This letter, it will be observed, informed the member

that the authority of Mr. R. A. Holmes, as their agent at St. Joseph, had been canceled, and that he was not authorized to take applications or receipt for money. Then the member was informed that he had not remitted for collections made at St. Joseph for two months, and that while he had reported to the association the names and amounts collected, he had not remitted. The member was advised not to make any more payments to Holmes, and his authority had ceased. The member was further advised that all payments previously made to respondent were properly credited to the members. They were then advised to whom to make future payments. Regrets were expressed that it had become necessary to cancel Holmes's authority, and the association hoped that the members at St. Joseph would continue their membership in the order. This letter seems to have had in view the fact that respondent had failed to remit certain dues. This failure may not have been for two months, but he had failed to remit at least a portion of the dues collected by him. It also appears to have been written with a view to preventing, if possible, the threats previously made by respondent, to take away from the order two-thirds of the St. Joseph members.

The rules of law applicable to qualified privileged communications is well settled in this State. In Finley v. Steele, 159 Mo. 299, the rule as applicable to this subject was very clearly stated. It was there said: "A qualified privilege 'extends to all communications made bona-fide upon any subject-matter in which the party communicating has an interest, or in reference to which he owes a duty to a person having a corresponding interest or duty; and to cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.' " And again: " 'The proper meaning of a privileged communication is said to be this: that the occasion on which it was made, rebuts the inference arising, prima-facie,

from a statement prejudicial to the character of the plaintiff; and puts it upon him to prove that there was malice in fact, and that the defendant was actuated by motives of personal spite or ill-will, independent of the circumstances in which the communication was made.' But when the paper published is a privileged communication, an additional burden of proof is put upon the plaintiff, and he must show the existence of express malice.''

It will be observed that the defendants in that case were members of a school board. The action against them emanated from a written charge made by the school board and filed with the school commissioner, which contained words of a defamatory character, and would have been otherwise libelous had it not been, as held by the court, a privileged communication, and there was no proof offered by the plaintiff of express malice.

In Wagner v. Scott, 164 Mo. 289, the plaintiff, Wagner, was chief engineer of a number of electric light companies. The president of one company wrote the president of another company, making charges against plaintiff's personal and professional standing. It was ruled in that case that the letter was defamatory and libelous, but that it was a privileged communication. It was further held that the evidence justified submitting to the jury the question of express malice, which, if it existed, would overcome the qualified privilege, and that therefore the court erred in nonsuiting the plaintiff. In the discussion of the law applicable to that case the court announced the legal principle that whether in a particular case a publication is deemed to be privileged, that is, whether the situation of the party making it and the circumstances attending it, were such as to rebut the legal inference of malice, is a question of law to be determined by the court in the first instance, and applying the principle of law stated to the plaintiff's evidence as it appeared

in the record in the cause then under consideration, it was held to have made a prima-facie case of express malice. The court said: ''The publication contained very grave charges against the plaintiff affecting his personal, professional and official standing and character, made in a quarter calculated to do him serious injury. His evidence tended to prove that the charges were false, that the defendant either knew or had the means of knowing that they were untrue. That the exigencies of the situation did not call for such charge for the protection of the interests the defendant had in charge, or warrant the language in which they were made, and that while the occasion was privileged, the publication was an abuse of the privilege. Hence the case ought to have gone to the jury.''

A careful analysis of the discussion by the court in the case last cited of the legal principles applicable to privileged communications, makes it plainly manifest that the nature and character of the charges contained in the publication are in a large measure controlling, when the point is reached for the determination as to whether the situation of the parties making the charge and the circumstances attending it, were such as to rebut the legal inference of malice. In other words, in the determination of that question, as was ruled in the case of Wagner v. Scott, supra, the exigencies of the situation are to be taken into consideration as to whether or not they warranted the charges made in the publication for the protection of the interests the defendant may have had under his control, or whether or not the language used in such publication under the circumstances was warranted, and was the language employed in such publication of such a nature and character as to indicate an abuse of such privilege.

It has been held in other jurisdictions that a statement by a stockholder to an officer of a corporation that a certain employee was a perjurer and a black-

mailer, and had assisted in fraudulently obtaining money from the corporation, if made without malice, is privileged. See notes to case of Chambers v. Leiser, Am. and Eng. Annotated Cases, vol. 10, p. 272.

Communications which would otherwise be actionable, would be privileged, if made in the course of an investigation of the conduct or ·character of one if its officers or members of a quasi-judicial body, such as a voluntary society, since a member by accepting a membership voluntarily submits himself to the jurisdiction of the association so long as it acts within the scope of its authority. [10 Am. and Eng. Ency. of Law (2 Ed.), p. 1035.] This rule has been applied to a lodge of Odd Fellows as well as a medical society.

Learned counsel for respondent very fairly, as well as clearly and correctly, stated in their brief the requirements of the law applicable to this subject. They say: "To give the words complained of the character of a qualified privilege it must appear that they were written by the defendant association in the discharge of some duty, public or private, legal or moral, and with the end or purpose in view, or in the conduct of some matter involving its interest, and that they were written for the protection of that interest, and that they were relevant and proper in that connection. It must also appear that they were uttered in good faith, and made on a proper occasion, from a proper motive, based upon a probable cause and in the honest belief that such statements were true." In our opinion this is a fair and full statement of the requirements of the law, and if the evidence disclosed by the record meets these requirements, it logically follows that the letter in question was a privileged communication. This confronts us with the inquiry as to whether the letter written by the association was in the discharge of some duty, and did the subject and matter upon which the letter written was predica-

ted affect the interests of the fraternal association? Manifestly the association had the right and it was its duty to communicate with its members. It clearly had the right and it was also its duty to investigate the conduct of its agents, and demand of them proper reports. There was no impropriety and it unquestionably had the right to notify its members at St. Joseph that the authority of respondent as agent had been canceled there and not to pay him any more money. It must not be overlooked that in some of the correspondence by the respondent he had threatened suit against the association and had also proclaimed that when he left the association he would take two-thirds of its members with him. These disclosures of the record clearly indicated that the interests of the association were involved, and the officials who were administering the affairs of such association doubtless became aroused concerning the threatened injury to their body, and in order to protect the interests of such association, in our opinion, appellant had the undoubted right to endeavor by all proper and appropriate methods to retain its membership, and to this end had the unquestioned right to communicate with the members of the association at St. Joseph guarding them against any efforts that might be made on the part of the respondent to disorganize the membership of the association at that place. The evidence as disclosed by the record strongly tends to prove that the respondent had not remitted his collections for December, and was still owing a part of the collections made by him in November. The record before us further discloses that prior to the writing of the letter upon which this action is predicated, the president of the fraternal association, in a businesslike way, had a thorough examination of the books made, which disclosed that respondent was indebted to the association in the sum of $127.99; hence it follows, if we are looking for a reason why this letter was written, such rea-

son is furnished by pointing to the fact that it was written both for the purpose of preventing members paying respondent more money, and to keep such members from leaving the fraternal association. Upon this state of the record it will certainly not be seriously contended that the association did not have reasonable cause to act, and that it did not act in good faith. The disclosures of the entire record clearly indicate that the association was acting in good faith from proper and legitimate motives, based upon the showing from an examination of the books of the indebtedness of respondent to the association, as well as upon the admissions of the respondent that he had in his hands certain moneys collected for the association, but which he would retain until there was a settlement with him. Under these circumstances the president and others in the chief office of the association had the data before them which was calculated to inspire the honest belief that the statements in the letter complained of were true, at least in substance.

After a most careful consideration of all the evidence and the showing made of the extremely courteous and kind treatment awarded respondent by the association throughout all their business relations, we see no escape from the conclusion that the letter complained of and upon which this action is based, was a qualified privileged communication; and in the absence of a showing of at least some sort of express malice, the trial court should have sustained appellant's demurrer to the evidence.

## II.

Having reached the conclusion, as herein indicated, that the letter which is the basis of this action was a qualified privileged communication, and should have been so treated by the trial court, then under the well settled rules of law as applicable to the proposition now under discussion, before the plaintiff was

entitled to recover upon such privileged communication it was absolutely essential that it appear in the letter itself that the exigencies of the situation did not call for the use of the language used for the protection of the interests the defendant had in charge, or in other words, while the communication was privileged, the nature and character of the language used should show an abuse of such privilege, or the plaintiff must assume the burden cast upon him and prove to the satisfaction of the jury that such communication was actuated by express or actual malice. "A privileged communication is an exception to the rule that every defamatory publication implies *malice*. A qualified privilege is extended to a communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty either legal, moral or social, if made to a person having a corresponding interest or duty and the burden of proving the existence of malice is cast upon the person claiming to have been defamed." [Newell on Slander and Libel (2 Ed.) p. 391, sec. 6; Finley v. Steele, 159 Mo. 299; Sullivan v. Com. Co., 152 Mo. 268.]

In Finley v. Steele, supra, this court referred to and quoted approvingly from Byam v. Collins, 111 N. Y. 143, and Klinck v. Colby, 46 N. Y. 427. The rules of law as applicable to the subject now under discussion were very clearly and tersely stated in those cases. It was said: "A libelous communication is regarded as privileged, if made bona-fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, if made to a person having a corresponding interest or duty, although it contains criminating matter which, without this privilege, would be slanderous and actionable; and this, though the duty be not a legal one, but only a moral or social duty of imperfect obligation. In speaking of the proper meaning of privileged com-

munications in Klinck v. Colby, 46 N. Y. 427, it is said: 'The proper meaning of a privileged communication, is said to be this: that the occasion on which it is made, rebuts the inference arising, prima-facie, from a statement prejudicial to the character of the plaintiff; and it puts it upon him to prove that there was malice in fact, and that the defendant was actuated by motives of personal spite or ill will, independent of the circumstances in which the communication was made.' But when the paper published is a privileged communication, an additional burden of proof is put upon the plaintiff, and he must show the existence of express malice."

In Massachusetts it was held that "the question whether in a particular case a publication is to be deemed privileged, that is, whether the situation of the party making it and the circumstances attending it were such as to rebut the legal inference of malice, is a question of law to be determined by the court in the first instance." [10 Am. and Eng. Anno. Cases, p. 1153.]

In Wagner v. Scott, 164 Mo. 289, this court, speaking through Judge BRACE, quotes the rule as announced by the Massachusetts court, and following such quotation says: "The sole duty of the court, therefore, in such cases, is to determine whether the occasion, in the absence of actual malice, would justify the publication. If so, then it is incumbent upon the plaintiff to prove the existence of malice in order to sustain his action; and this must be shown to the satisfaction of the jury."

Our attention is directed to the case of Sullivan v. Com. Co., 152 Mo. 268, where it was held by this court that the circuit court erred in holding that the communication complained of was privileged, and that the occasion did not justify the terms employed. But it must not be overlooked that the terms employed in the communication forming the basis of the action in

the Sullivan case were entirely unlike the language used in the case at bar. It will also be observed that the court in passing upon it determined nothing more than that there was evidence justifying the submission of the question of malice to the jury. In fact it was there announced that ''it was a question of law for the court whether the letter was a privileged communication, but malice was a question of fact for the jury, if there was any evidence whatever of malice.''

After a thorough examination and consideration of the authorities applicable to the propositions involved in this case, we find that the weight of authority holds that where a libelous communication or writing is alleged to be privileged, it is incumbent upon the court to determine this question in the first instance. The burden of showing the privileged character of such communication rests with the defendant. If in the judgment of the court the communication is a privileged one, then the burden of proof shifts to the plaintiff, and in order to entitle him to recover, it is essential that he show actual or express malice, and if upon such showing there is no substantial evidence of the existence of actual or express malice, then it is the duty of the court to sustain the demurrer to the evidence.

We have indicated the controlling legal principles applicable to cases of this character, and the next question which confronts us is as to whether or not the evidence as disclosed by the record substantially tended to show the existence of actual or express malice.

We have read in detail all the evidence developed upon the trial of this cause, and in our opinion, considering in detail all of the testimony disclosed by the record, it absolutely fails in any sort of a substantial way to show malice upon the part of the fraternal association in the writing of the communication upon which this action is based. On the other

hand, the record when examined in its entirety clearly negatives the existence of any malice whatever in the writing of that communication.

The language in the letter in the case at bar must not be confounded with the language used in a number of other cases to which reference has been made. In this letter there was an entire absence of any abusive language or any grave charges made against the plaintiff, and we are unable to see, under the conditions surrounding the fraternal association, how a communication could have used less pointed terms in order to effect the purpose of protecting the interests of the association. The officers administering the affairs of the defendant association had always treated plaintiff courteously, and in fact made efforts to amicably settle the dispute that had arisen about the collection of dues under the contracts with the plaintiff. Prior to the writing of the letter the president and other officers in the chief office made a thorough investigation of the account of the respondent, and the books disclosed that he was indebted to the association in the sum of $127.99. The plaintiff refused to remit certain moneys collected for December, 1904, and part of the money collected for November, 1904; this is practically conceded. Again, it must not be overlooked that the record discloses that the plaintiff had threatened to bring suit against the association and take two-thirds of the St. Joseph membership from it when he left. The record also discloses that this fraternal association proceeded in an orderly and business-like way, in perfect accord with the contract between it and the plaintiff, to cancel the authority of respondent's agency. The letter complained of was sent *exclusively* to the members of the order at St. Joseph, and informed them of the cancellation of plaintiff's agency, with the additional information that he had failed to remit

for the last two months, which the testimony strong-ly indicates was substantially true.    There was, in the many letters written by the association to re-spondent, an entire absence of anything to indicate any spite, ill-will or malice toward him by the associa-tion or by any of the officers of the association.

The trial court seems to have treated the letter upon which this action is predicated as libelous *per se,* and in accordance with such views so instructed the jury.    This, in our opinion, was a misconception of the nature and character of such letter.

Under all the facts and circumstances disclosed by the record we are of the opinion that the causes which induced the association to write the letter com-plained of, were reasonably sufficient to inspire the honest belief on the part of the officers administering the affairs of such association that it was essential to write the communication, embracing therein the state-ments made for the purpose of protecting the inter-ests of the association.    Considering the entire record, in our opinion, this letter was written without malice and in good faith, based upon a reasonable cause, and the trial court should, at the close of the case, have sustained the demurrer to the evidence which was interposed by the defendant.

### III.

The conclusions reached upon the first and sec-ond propositions, as herein indicated, render it un-necessary to discuss at any length the third proposi-tion, predicated upon the allegations in the answer that the statements embraced in the communication were true.

As heretofore stated, the evidence in this case is almost conclusive of the fact that respondent was in-debted to the appellant; in fact it is practically con-ceded that he did not remit to the association the col-lections made by him for the month of December, 1904,

amounting to sixty-four dollars and some cents. The principal discrepancy between the statements of the letter and the proof is, the letter alleges that the plaintiff had not remitted any of his collections for the last two months, and it is earnestly contended that this statement had reference to September and October, or October and November. However, it is obvious that the letter had reference to November and December. One other discrepancy is that the letter states that the collections had not been remitted for two months, when the testimony shows that this was not literally true; that a part of the collections for November had been remitted, and it was only the collections for the month of December that the plaintiff had wholly neglected to remit. But aside from all this, when all of the evidence is considered it does appear that when the letter in question was written respondent had not remitted any of his collections for the month of December, and had failed to remit part of his collections for the month of November, and was indebted to the appellant association for collections made and not permitted to appellant for these two months. The plaintiff having failed to remit moneys which belonged to the appellant, it was clearly proper and appropriate, considering the relationship of the association to its members, to inform them of the cancellation of the agency of the plaintiff, and also inform them that the agent having had authority to collect dues, the respective members of the association would receive proper credit.

Plaintiff largely based his right to retain these collections upon claims which he made for further "skip" payments, as they were termed, and for an additional ten per cent commission on collections. Both of these claims were rejected by the circuit court, and we think properly so, for the reason that they were directly in conflict with the provisions of both contracts entered into between the plaintiff and the association.

We see no necessity for discussing this proposition further. It is sufficient to say that the evidence, when considered in its entirety, show that at least in substance what was stated in the letter was true. That the defendant did not intend, by this communication, to charge the plaintiff with the commission of any crime, and that it was written by the defendant association without malice, we have no doubt. The plaintiff was a member of the association, and doubtless the respective members of the fraternal order to whom this letter was addressed were fully aware as to the dispute between the plaintiff and defendant concerning the collection of dues, and in our opinion any injury to the standing, reputation or character of the plaintiff, under the facts of this case is more imaginary than real.

We have given expression to our views upon the legal propositions disclosed by the record, which results in the conclusion that the judgment of the trial court should be reversed. All concur.