FLORINDA GUST, APPELLANT, v. MONTGOMERY WARD & COMPANY, RESPONDENT.—80 S. W. (2d) 286.

Springfield Court of Appeals.  March 4, 1935.

Rehearing denied March 27, 1935.

*Thompson & Roberts* and *Russell Mallett* for appellant.

*Paul E. Bradley* and *Charles M. Grayston* for respondent.

BAILEY, J.—Plaintiff brought suit to recover damages on account of certain slanderous words used toward her by one of defendant's employees in its store in Joplin, Missouri. On trial to a jury, plaintiff, appellant here, recovered a verdict in the sum of $1500. Thereafter the trial court sustained defendant's motion for new trial and plaintiff has appealed from the order granting the new trial.

The motion for new trial contained a number of grounds, one of which was, that the trial court erred in refusing to give an instruction for defendant in the nature of a demurrer to the evidence offered at the close of the whole case. A further ground set up was that the verdict was against the weight of the evidence. The trial court, however, sustained the motion on the ground that there was no evidence to support the verdict and not upon the theory that the weight of the evidence was against the verdict. Had the motion been sustained upon the latter ground, it would be upheld on appeal without a review of the evidence, in the absence of a showing that

the trial court had abused its discretion in granting one new trial. [Somerville v. Stockton, 178 Mo. 121, 77 S. W. 298.]

The motion having been sustained upon the former ground, we are required to review the evidence in order to determine if there was offered any substantial evidence on behalf of plaintiff to support the verdict. [Gates v. Dr. Nichols' Sanatorium, 55 S. W. (2d) 424, 331 Mo. 754.]

First referring to the pleadings, the petition alleged that one of defendant's employees, a floor supervisor in defendant's store located on a prominent business corner in Joplin, did, on the 24th of December, 1933, follow plaintiff and others who were with her, onto the sidewalk in front of the store, and in a loud and angry voice falsely and maliciously accused plaintiff and the others who were with her of being "shoplifters" and that they had stolen merchandise and hid it in their clothes and that "shoplifters don't steal anything off my floor and get away with it;" that she was going to get the merchandise if she had to tear their clothes off. Defendant filed an answer denying that the alleged words were spoken by the said Irene Hoffman, but setting up that if such words were spoken, the occasion was one of privilege and there was therefore no liability on the part of defendant.

The evidence on behalf of plaintiff, as shown by her own testimony, was that she lived in Crestline, Kansas, a short distance from Joplin; that she was thirty-two years of age and married to Dewey Gust, a farmer; that on the 23rd day of December, 1933, she came to Joplin with her sister, Gladys Titus, and her two sisters-in-law, Daisy Hurst and Gladys Hurst, for the purpose of buying a coat for her mother; that she went into the east door of the Montgomery Ward & Company store in Joplin and to the back of the first floor, up the stairs to the second floor and then to the east or front end of the second floor to the women's department, where the coats and dresses were, and that she did not notice at that time that there were any dresses there; that she did not go inside the coat department but stood at the door while the others went in and looked at a coat on a model; that they failed to find any coat that was suitable and she and her companions then walked back to the west end of the store and stopped for a moment near the doorway where someone was exhibiting a mechanical toy; that they then went downstairs and through the store to the front door; that "as they stepped outside the door to the entrance way of the building Daisy Hurst, Gladys Hurst and herself stopped to look in the window, together with Gladys Hurst's little boy, and Gladys Titus walked on down the street a short distance; that Gladys Titus had a coat in a box which was taped up which she had purchased at another store; that she and all of her companions had packages and things in their arms which they had purchased; that a clerk, Irene Hoffman, rushed out of the

store and grabbed Daisy Hurst as she and her two companions were standing looking into the window; that the clerk, Irene Hoffman, grabbed Daisy Hurst, jerked open her coat and said, 'Here these shoplifters are;' that she was talking in a loud tone of voice and drew a large crowd, opened her coat and felt under her arms and said, 'These shoplifters, you stole something off my floor and I am going to get it if I have to tear your clothes off right here on the street,' and said, 'Shoplifters don't steal anything off my floor and get away with it; all of you stand still or I will call an officer and have you put in jail;' that the clerk, Irene Hoffman, then grabbed the witness (plaintiff) who was standing next, jerked her coat open, tore her dress down the side, all the time talking as loud as she could talk; that a large crowd gathered around; that she felt under the witness' coat and in her packages; that the witness did not know any of the people in the crowd for sure; that she was too nervous and excited and didn't pay any attention; that after the clerk had jerked her coat and torn her dress she kept saying, 'Here these shoplifters are,' and 'I am going to get this merchandise,' 'Some of you stole it and I am going to find it,' 'Shoplifters don't steal anything off my floor;' that the clerk was screaming at the top of her voice; that she grabbed Gladys Titus and jerked a button off her coat and looked under her arms and looked in Daisy Hurst's packages; that the clerk jerked open a pair of socks and story book which the witness had with her.''

The witness further testified that ''the clerk never asked their consent to search them; that she told the plaintiff and her companions to stand still or she would call an officer and have them put in jail; that the clerk felt under the sweater of Gladys Hurst's little boy, ran and jerked open the box out of Gladys Titus' arms and opened it and looked in it and said, 'Some of you has this merchandise and I am going to find it if I have to tear your clothes off you;' screamed and hollered; that her sister, Gladys Titus, said, 'What is going on?' and the clerk, Irene Hoffman, said, 'That is all right, that is all right, stand still or I will call an officer and have you put in jail;' that she had never been arrested and didn't want to be and was very excited.''

The witness further testified that, ''the clerk then ran back into the store and the witness and her companions followed her in and to the back of the store; that the clerk ran upstairs and when she saw she was followed turned around and ran back downstairs all the time hollering, 'That is all right; that is all right' and then disappeared.''

The witness testified that, ''they then asked for the manager, had a talk with him, the manager told them that he didn't know anything about what happened and then afterwards he said he sent her out there; that he was mistaken; that the clerk was responsible for

stuff stolen; that the witness never circulated any reports as to what happened at the store on that afternoon; that she subsequently was told that it was being said that she had been accused of shop-lifting.''

The witness testified that, ''when the clerk made the statements in front of the store the witness noticed she had a brown silk dress hanging on her arm; that the plaintiff and her companions had taken nothing or attempted to take anything from the store; that they had touched nothing in the store.''

### CROSS-EXAMINATION.

On cross-examination the witness testified as follows: ''That when she was upstairs near the coat department she noticed several people near the toy department but did not see anyone except the clerks back in the ready-to-wear department; that one of the clerks asked some one of the plaintiff's companions if they wanted anything and they said they didn't think so; that neither the plaintiff nor her companions got together and held a whispered conversation; that she did not see any of them stop and appear to be examining furniture as they went out; did not notice any furniture; that a few minutes after the clerk came outside a crowd of seventy-five or 100 gathered around the front of the store; that the clerk was out in front of the store probably five minutes; that she talked loud so that she might be heard two blocks away.''

Plaintiff's companions gave testimony practically the same as above set forth, except that none of the others estimated that Irene Hoffman could have been heard talking two block away at the time of the accident, but rather that she could have been heard across the street or a few feet. One witness for plaintiff, who was of her party, did not hear the words spoken of and to plaintiff, although she was but a few feet away.

Irene Hoffman testified on behalf of defendant that she was a sales-lady in charge of the ladies' ready-to-wear department of defendant's store; that on the 23rd of December, 1933, plaintiff, Florinda Gust together with the other ladies, all of whom were unknown to her at that time, came into her department; that it was the Saturday before Christmas, and they were busy; that she checked the dresses on the racks every fifteen to thirty minutes to see that they were filled an⸍ properly sized; that just after these ladies entered, she observed them looking at dresses and she walked around one dress rack which she had just checked and found an empty hanger; that she then offered to wait on the ladies but they said they were just looking; that some of them also looked at coats but refused to try any of them on; that these four ladies were the only ones in that part of the department; that she ''felt quite sure that one of these ladies had the dress because there was no one in the department and all the dresses were there, and when witness went back, the dress was gone and these

four ladies were the only ones that were around the dress racks or could possibly have had the dress and, of course, when this lady hurried ahead of the other ladies and held herself like this, like she might have something under her arm, witness thought that she was the lady that had the dress, and she went out ahead of the other ladies, and the three ladies all left the department and went up in the toy department in the front of the store and sort of looked around at merchandise, and the one larger lady walked away from the other three and went around to the north side of the store and looked at living room furniture, and witness noticed this lady stooping over a living room davenport, sort of in between the chair and the living room suite, like she was examining the curtains, but witness thought the other lady had the dress because she held her side and acted suspicious; they looked around a little while and then the larger lady met the three ladies at the head of the stairs and they all went down and out together and slowly out of the store, and just before they went out, right at the front door, they all got their heads together. Witness couldn't hear what they said, and then they went out.

"After the ladies got out on the sidewalk, and the lady that witness thought was holding something under her arm that acted suspicious, witness opened her coat and looked into it, looked into the coats of the other two ladies, and didn't touch them. Witness was taller than they are and they had their arms at their sides and didn't look as if they had anything under their coats. The fourth lady was clear out on the curbing, had a box under her arm, and witness walked up to her and asked the first lady that witness opened her coat, witness said, 'Wait a minute, please,' and looked into one side of her coat, just pulled one side of her coat back, and she was holding her hands, her arms, so tight; the other lady had walked clear to the curbing and witness said, 'May I see in your box please?' and she said, 'Certainly.' The box was either tied or taped in the center, but she lifted one end of the box and witness looked into it, and as soon as witness saw they did not have the dress, she thought where the large lady was standing and hurried back into the store back to the living room suite, and underneath this davenport was her dress."

The witness further denied having called plaintiff or any of the ladies "shoplifters," or that she had spoken in a loud voice.

For the purposes of considering the demurrer to the evidence, plaintiff's statement of what transpired must be accepted as true. If that evidence was sufficient to make a question for the jury the trial court's action in granting a new trial on the ground that a peremptory instruction should have been given for defendant, cannot be sustained. Defendant's position is that even though the words alleged to have been spoken by Irene Hoffman were spoken to plaintiff on the sidewalk in front of defendant's store in a loud voice and

in the presence of others, yet the occasion was one of qualified privilege and therefore defendant could not be held liable in the absence of proof of express malice. Plaintiff practically admits that the occasion was one of qualified or conditional privilege but that plaintiff's evidence shows the use of disproportionate and violent language in a wanton, reckless and careless manner and that such acts were more than sufficient evidence of malice to require a submission of the case to the jury.

The legal principles involved are well settled and will be referred to briefly. In 36 C. J. 1241, it is said that a qualified privilege is, one which, "relates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty." Ordinarily where defamatory words are published in regard to another, malice may be implied. But where the occasion is privileged the presumption of malice is thereby rebutted and the burden is cast upon the plaintiff to prove express malice. [Peak v. Taubman, 251 Mo. 390, l. c. 419, 158 S. W. 656; Butler v. Freeman, 216 Mo. App. 636, 260 S. W. 523; Garey v. Jackson, 197 Mo. App. 217, l. c. 230, 193 S. W. 920; 17 R. C. L. 341, sec. 88.]

It is also held that the question is for the court in the first instance to determine whether or not the occasion was one of privilege. [Wagner v. Scott, 164 Mo. 289, l. c. 302, 63 S. W. 1107; Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S. W. 100, 26 L. R. A. (N. S.) 1080.]

But the same cases hold that the question of malice or good faith in publishing the defamatory words, is for the jury except where there is no substantial evidence of the existence of actual or express malice. It is further well settled that the qualified privilege of the occasion may be lost by abuse thereof in the use of statements which do not relate to the subject or the occasion but are of an impertinent nature. Also the courts pretty generally hold that although the words used may relate to the occasion, if they are excessive because of their undue violence or improper nature, the privilege may be lost. In a given state of facts it would seem that the question as to whether or not the communication was outside the scope of the privileged occasion, would be one for the court, but whether or not the communication was excessive because of its violent and improper nature would ordinarily be for the jury. In Wagner v. Scott, supra, it was held that while the question of whether or not a given occasion was one of privilege is for the court, it is for the jury to determine whether or not there was malice in the publication. That

case recognizes the rule, however, that in the absence of some substantial evidence of express or actual malice the court may take the question of malice from the jury and direct a verdict for defendant, but that it would not be necessary to prove malice by extrinsic evidence; that it might be inferred from the relation of the parties, the circumstances attending the publication, and even from the terms of the publication itself. In the recent case of Conrad v. Allis-Chalmers Manufacturing Company, 73 S. W. (2d) 438, l. c. 447, following the authority of Wagner v. Scott, supra, it was said by the Court of Appeals that, "In cases of qualified privilege, the privilege to be extended depends not only upon the occasion which calls forth the publication, but upon the character of the communication; and, if the communication itself exceeds the privilege, it in itself, furnishes the evidence of express malice." But neither Wagner v. Scott, nor any other case that has been brought to our attention, holds that in all cases the question of malice must be submitted to a jury. There is no apparent reason why a different rule should be applied in a slander case than in other suits at law, and where the words spoken or written are clearly within the privilege of the occasion and there is no substantial evidence of malicious intent, certainly the trial court would have the right to direct a verdict for defendant. If the manner in which words be spoken and the words themselves so transcend the bounds of the privilege that reasonable men might differ on the question as to whether or not such manner and such words indicated the presence of malice, then in our opinion, the court should not take that question from the jury.

The slanderous words upon which this action is founded, according to plaintiff's petition and as submitted in plaintiff's given instruction were: "Here these shoplifters are. Give me that merchandise you stole. You stole that merchandise and hid it in your clothes. Some of you hid it in your clothes, but you won't get away with it." These words charged plaintiff with a crime, that of larceny, and would be actionable *per se* except for the privilege of the occasion. The occasion being one of privilege, however, the presumption of malice from the use of the words themselves would not obtain and under the authorities cited the burden was cast upon plaintiff to prove that there was actual or express malice as distinguished from implied malice. The words used were clearly within the exigencies of the occasion, there being no charge other than the theft itself. It cannot be said the words used were intemperate considering the excitement of the moment. It is urged that there is evidence of actual malice in the fact that the words were spoken in a loud voice or screamed, as plaintiff testified. Her testimony that the accusations could have been heard two blocks is so unreasonable as to be unbelievable in view of the fact that one of her companions, a few feet away, as the

evidence shows, did not hear any of the language used or know of the search until she herself was afterward approached, accused and searched. It is our opinion that where the words, used were within the privilege of the occasion, the mere fact that under the stress of excitement they were spoken unusually loud would be no evidence of actual malice. At the most it is as consistent with lack of malice as of malice. In Newell on Slander and Libel (3rd Ed.), art. 397, it is said, that "if the evidence adduced is equally consistent with either the existence or non-existence of malice, there can be no recovery, for there is nothing to rebut the presumption which has arisen in favor of the defendant from the privilege of communication." The evidence shows that plaintiff and her companions were all strangers to Mrs. Hoffman and there is no apparent reason why she should bear them any ill will or be actuated by malicious motives in doing what she did. It is more reasonable that in protecting the interests of her employer she did what she did, hesitatingly, but in the honest belief that the plaintiff and her companions had stolen the dress and were therefore guilty of shoplifting. In other words there is nothing in the surrounding circumstances to indicate the use of a loud and excitable voice and strong language was actuated by actual malice. We agree with the conclusion of the trial court that plaintiff failed to offer evidence sufficient to destroy the privilege.

One of the grounds for granting the new trial was alleged error in giving instruction No. 2, for plaintiff. The instruction required the jury to find from the preponderance of the evidence that Irene Hoffman spoke "the words claimed by the plaintiff to have been spoken." In this respect the instruction was subject to criticism in that it did not set forth the alleged slanderous words. This may have been cured by a subsequent instruction in which the words alleged to have been published were fully set out, but in the event of retrial the instructions should be so framed as to clearly define the issues. The instruction complained of required the jury to find the words were spoken maliciously and we find no fault with the instruction in that respect.

Plaintiff's given instruction No. 5, was as follows:

"The court instructs the jury that malice does not consist alone in personal spite or ill will, but exists in law whenever a wrongful act is intentionally done without just cause or excuse."

It is urged that this instruction improperly defines malice. It has been approved in a number of Missouri cases and was proper. [Reese v. Fife, 279 S. W. 427.]

In the case of Butler v. Freyman, 260 S. W. 523, an instruction containing the same definition was approved in that respect, but disapproved in not requiring proof of actual malice in a subsequent portion of the instruction.

We have considered other alleged errors in the trial of the case but find no merit therein. For the reasons heretofore stated the order of the trial court in sustaining the motion for new trial should be sustained. It is so ordered. *Allen, P. J.,* and *Smith, J.,* concur.