Emma BROWN, Plaintiff-Respondent,

v.

P.N. HIRSCH & COMPANY STORES, INC., Defendant-Appellant.

No. WD 33,978.

Missouri Court of Appeals, Western District.

Sept. 27, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 29, 1983.

Application to Transfer Denied Jan. 17, 1984.

---

Jeffrey T. O'Conner, Kansas City, for defendant-appellant.

J. Michael Cronan, Cronan & Messick, Kansas City, for plaintiff-respondent.

Before TURNAGE, P.J., and PRITCHARD and KENNEDY, JJ.

TURNAGE, Presiding Judge.

Emma Brown filed suit against P.N. Hirsch & Company for false imprisonment and slander. The court directed a verdict in favor of Hirsch on the false imprisonment count, and entered judgment on the jury's verdict in favor of Brown on the slander count for $5,000 actual damages and $100,000 punitive damages.

On this appeal Hirsch contends the court gave an erroneous verdict directing instruction. Reversed and remanded.

This suit arose from an incident which occurred while Emma and her husband, Robert, were in the Hirsch store in Boonville in October, 1980. According to Emma's evidence, the couple had been in the store five to ten minutes looking at various articles when they stopped at a rack holding mens' wallets. This rack was located near the checkout counter. Robert picked up a wallet and handed it to Emma for her to examine and Emma returned it to Robert. According to Emma, Cheetah Maupin, the store manager, approached the Browns at this point and asked "Are you going to pay for it or put it back?" Emma stated that Cheetah accused her of stealing a wallet by placing it in her pocket. Emma said she told Cheetah that she could search her clothing, which Cheetah proceeded to do without finding any wallet. Emma stated that after a heated exchange about the incident, which was conducted in loud language in the hearing of other persons, Cheetah ordered the couple to leave the store. After the Browns left the store Emma went to a nearby restaurant where her mother was employed. Emma cried and told her mother about the events at the Hirsch Store. Emma's mother, Mary Taylor, accompanied Emma, without her husband, back to the Hirsch store.

When Emma and Mary returned to the Hirsch Store, Mary asked Cheetah about the earlier incident. According to Emma, Cheetah replied that Emma had stolen a billfold and that Emma had been in the store every day for a week taking something. Emma denied stealing and Emma and Cheetah again engaged in a heated exchange in loud voices. Cheetah again ordered Emma to leave the store and Mary led Emma away.

Emma's evidence also showed that various employees of the Hirsch Store had been told by Cheetah and other store managers to watch out for young black girls who come into the store to see if they were taking merchandise. Emma is a young black female.

Cheetah's version of the incident was that the Browns were looking at mens' billfolds and she saw Emma put one in her pocket. It was at that point that Cheetah told Emma "I saw that" and that she could either pay for it, put it back, or Cheetah could do something else. Emma took the billfold out of her pocket and threw it across several counters. Cheetah said Emma made several ugly remarks to her and became quite upset. Cheetah denied searching Emma and denied accusing her of stealing on previous occasions.

Cheetah testified that she subsequently told Harvey Fogle, a Boonville police officer that she had caught Emma shoplifting and that Emma had been in the store previously and had taken things. Cheetah also testified that she told Mary Lou Pottus, an employee of a Coast-to-Coast store in Boonville and two employees at the Wee Discount Store in Boonville, that she had caught Emma shoplifting. Emma testified that when she was in these two stores after the Hirsch incident she was followed closely by employees during the time she was in the store.

The court gave the following verdict director patterned after MAI 23.10(1). The verdict director read as follows:

Your verdict must be for plaintiff if you believe:

First, Cheetah Maupin was an employee of P.N. Hirsch and Company Stores, Inc. and was acting within the scope and course of her employment by P.N. Hirsch and Company Stores, Inc., and

Second, Cheetah Maupin stated either: "She [Emma Brown] was caught shoplifting", or

"She [Emma Brown] stole a billfold", or

"She [Emma Brown] had been in the store before taking things", and

Third, Cheetah Maupin was at fault in making any one or more of the statements submitted in paragraph Second, and

Fourth, such statement or statements referred to in paragraphs Second and Third exposed plaintiff to ridicule or deprived plaintiff of the benefit of public confidence and social associations, and

Fifth, such statement or statements referred to in paragraphs Second, Third and Fourth were heard by one or more of the following: Mr. Robert Brown, Mr. Harvey L. Fogel, Mrs. Mary Taylor, Mrs. Rickie Hammond, or Mrs. Mary Lou Pottus, and

Sixth, plaintiff Emma Brown's reputation was thereby damaged.

Acts were within the "scope and course of employment" as that phrase is used in this instruction even though not specifically authorized by P.N. Hirsch and Company Stores, Inc. if:

1. They were done by Cheetah Maupin to further the business of P.N. Hirsch and Co. Stores, Inc. under the general authority and direction of P.N. Hirsch and Co. Stores, Inc., and

2. They naturally arose from the performance of Cheetah Maupin's work.

■ The principal contention made by Hirsch is that the above instruction was patterned after MAI 23.10(1) which is for use in cases when no privilege is involved. Hirsch contends that the statement made by Cheetah while the Browns were in the store was qualifiedly privileged and for that reason the verdict director should have submitted the issue of malice as contained in MAI 23.10(2) to overcome the privilege. In this contention Hirsch is correct because the Notes on Use to 23.10(1) state "it is a question of law for the court to decide whether qualified privilege applies. Use MAI 23.-10(2) if the court determines qualified privilege is applicable."

Hirsch pleaded qualified privilege in its answer. The store also filed a motion for a directed verdict at the end of Emma's case and at the close of all the evidence alleging the incident in the store gave rise to a qualified privilege which could only be overcome by a finding by the jury of malice on the part of Cheetah. That contention has been carried forth in the motion for new trial and on this appeal. Thus, the relevant question is whether or not Cheetah's accusation that Emma was stealing was qualifiedly privileged.

In *Gust v. Montgomery Ward & Co.,* 229 Mo.App. 371, 80 S.W.2d 286 (1935) the court was confronted with a similar situation. Mrs. Gust and her two sisters-in-law had just left the Montgomery Ward store where they had been shopping and were on the sidewalk in front when a clerk ran out and said "[H]ere these shoplifters are. Give me that merchandise you stole. You stole that merchandise and hid it in your clothes. Some of you hid it in your clothes but you won't get away with it." The court quoted the applicable rule defining qualified privilege as a privilege which:

"[R]elates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, private, either legal, judicial, political, moral or social, made to a person having a corresponding interest or duty."

*Id.* 80 S.W.2d at 290[5–13].

■ The Gust court held that ordinarily when defamatory words are published malice may be implied, but when the occasion is privileged, the presumption of malice is rebutted and the burden is on the plaintiff to prove express malice. The court held that the words spoken by the store clerk were qualifiedly privileged. The question of malice or of good faith in the publishing of the defamatory material is for the jury

except when there is no substantial evidence to support such a finding.

Under the holding in *Gust* it is apparent that the words spoken by Cheetah when she first confronted Emma and Robert called for the submission to the jury of this case under the law applicable to qualified privilege. That being true the verdict director was erroneous because it followed MAI 23.-10(1) instead of MAI 23.10(2) as directed by the Notes on Use.

The verdict director combined all of the statements made by Cheetah on the four different occasions that Emma's evidence showed she said that Emma had stolen merchandise. The initial incident was heard by Emma's husband, Robert, and Mrs. Rickie Hammond. The second incident involved the conversation with Emma and her mother, Mary. The third was the conversation with officer Fogel, and the fourth, with Mary Lou Pottus. The conclusion reached above that the initial words spoken by Cheetah at the time Emma and Robert were in the store were qualifiedly privileged would apply only to that incident. The words spoken to Officer Fogel, to Emma's mother, Mary, and Mary Lou Pottus require separate treatment.

■ The words spoken to Officer Fogle were also qualifiedly privileged under the rule applied by the majority of states Annot., Defamation—Communication to Police, ·140 A.L.R. 1466, 1471 (1942). This court in *Davenport v. Armstead*, 255 S.W.2d 132, 134 (Mo.App.1952) held that a communication to law enforcement officers for the purpose of helping bring a criminal to justice are not absolutely privileged. While the court did not expressly hold that such communication was subject to a qualified privilege, it discussed whether the evidence would support an instruction based on qualified privilege. Thus the court held by implication that such communications are qualifiedly privileged and this court now holds expressly that such communications are qualifiedly privileged. For that reason an instruction submitting the words spoken by Cheetah to Officer Fogle should have

also been framed under MAI 23.10(2) which submits the question of malice to the jury.

■ The statement made by Cheetah to Mary Taylor when she took her daughter into the Hirsch store presents a different question. Emma's counsel read excerpts from the deposition of Mary because Mary did not testify in person. The portion read stated that when Mary entered the Hirsch store Cheetah approached her and said nothing until Mary inquired "[w]hat happened to my daughter?" Mary said that Cheetah then told her that Emma had stolen a billfold. She also said that Cheetah told her that she did not want Emma in the store any more and told Emma to get out. She also said that Cheetah had said that Emma had been in there every day for the last week taking something. In *Williams v. School District of Springfield R–12, et al.,* 447 S.W.2d 256, 268[21, 22] (Mo.1969), the court quoted from 33 Am.Jur., *Libel & Slander,* Section 93, pp. 105–106: "It is generally held that the publication, of a libel or slander, *invited* or *procured* by the plaintiff, or by a person acting for him in the matter, is not sufficient to support an action for defamation." The court held that absolute privilege is confined to few situations but it does extend to publications made with the consent of the plaintiff. It is apparent that the statements by Cheetah to Mary were in response to questions asked by Mary concerning the prior incident and it is further apparent that Mary was acting for Emma in the matter. Under *Williams* the words spoken in response to Mary's inquiry were spoken with consent and were, thus, absolutely privileged. That being true the verdict director should not have submitted any words spoken when Mary and Emma returned to the Hirsch store because such words were spoken with Mary's consent.

■ The fourth occasion on which Cheetah accused Emma of stealing was her statement made subsequent to the two incidents in the Hirsch store. Cheetah admitted that she told Mary Lou Pottus of the Coast-to-Coast store and two employees at the Wee Discount Store that she had caught Emma shoplifting, however, only the state-

ment to Pottus was mentioned in the verdict director. Under the rule governing the application of the doctrine of qualified privilege quoted above from *Gust* the statement to Pottus was not qualifiedly privileged. In her initial confrontation with Emma, Cheetah had an interest and a duty upon the subject matter of the communication; specifically that she had caught Emma shoplifting and Emma had a corresponding interest. The same cannot be said of Cheetah's statement to Pottus. Pottus had no duty or interest in the statement made by Cheetah concerning an incident which did not involve Pottus or her employer's property. The statement made by Cheetah to Pottus that she had caught Emma shoplifting was the accusation of a crime and was slander per se. *Hoog v. Strauss,* 567 S.W.2d 353, 357[6, 7] (Mo.App.1978). Of course, a statement constituting slander per se eliminates the plaintiff's need to show actual damages. *White v. American Postal Workers Union, St. Louis,* 579 S.W.2d 671, 674[3] (Mo.App.1979). On retrial this statement would be properly submitted under a slander per se instruction.

Hirsch raises other questions which may arise on re-trial and so will be briefly noted.

■ Hirsch contends that there was insufficient evidence upon which the jury could find that Cheetah Maupin was an agent of Hirsch acting within the scope of her employment at the time she made the slanderous remarks. Hirsch admitted throughout that Cheetah was employed by it as the store manager and never claimed at trial that Cheetah was not acting within the scope of her duties. Hirsch cannot now take the position that she was acting outside the scope of her employment when that was not its trial theory. *Herrington v. Hall,* 624 S.W.2d 148, 153[6] (Mo.App.1981).

■ Hirsch also contends that Emma did not produce evidence of actual malice and, thus, the defense of qualified privilege should prevail. Emma produced evidence from a number of Hirsch employees that they had been instructed by both Cheetah and previous store managers to watch for young black girls entering the store to see if they were taking merchandise. There was no evidence that employees had been instructed to watch for other persons or other classes of persons. From these instructions to its employees, the jury could infer that malice did exist against young black girls, of which Emma was one.

Other matters raised need not arise on re-trial, but in the event they do the parties have the benefit of the briefs.

The judgment is reversed and this case is remanded for further proceedings.

All concur.