POLK *v.* MISSOURI PACIFIC RAILROAD COMPANY.

Opinion delivered November 27, 1922.

1. LIBEL AND SLANDER—PRIVILEGED COMMUNICATION.—Where a railway division superintendent in good faith believed that a section boss had charged overtime for certain hands, and an investigation was being had as to the reason for discharging such hands, a statement by the superintendent to the section boss in the hearing of representatives of the brotherhood to which the latter belonged that, unless he reimbursed the company for the time out of which he had defrauded it, he was liable to criminal prosecution, was conditionally privileged.

2. CORPORATIONS—TEST OF LIABILITY FOR SLANDER.—To establish liability against a corporation for slander, the utterance of the slander must be shown to have been made by its authority or ratified by it or have been made by one of its servants or agents in the scope of his employment or in the course of the business in which he is employed.

3. CORPORATIONS—LIABILITY OF RAILROAD FOR SLANDER.—Where a railroad superintendent in a conference with plaintiff, who was a section boss, and in the presence of members of plaintiff's brotherhood, stated that plaintiff was liable to criminal prosecution if he did not reimburse the company for money of which he had defrauded it, and that he was discharged on that account, the contract between the railroad and the brotherhood requiring the railroad to furnish specifications of charges to the brotherhood, the statement, if actionable as to the superintendent, was also actionable as to the railroad, on the ground that the superintendent was acting within the scope of his employment and in the course of the business in which he was employed.

Appeal from Independence Circuit Court; *Dene H. Coleman,* Judge; affirmed.

*W. M. Thompson,* for appellant.

The communication passing between appellant and Daniels, in his individual capacity and as superintendent for the railroad company, was not a privileged communication, either absolute or qualified. Am. & Eng. Encyc. of Law, 2 ed. vol. 18, p. 1023; *Id.* 1029; 100 Ark. 477. Daniel did not exceed his authority. He was clothed with authority to employ and discharge section foremen. The railroad company is liable for his tort. 29 Ky. Law Rep. 861; 96 S. W. 551; 8 L. R. A. (N. S.) 1023. The testimony shows that it ratified his action. 100 Ark. 477. Malice on the part of Daniel toward appellant was shown not only by his attitude toward him, but also by the defamatory words used. 56 Ark. 100; 19 S. W. 236; Am. & Eng. Encyc. of Law, 2nd ed., 1043. Even though the slanderous words used be held as coming under the rule of qualified privilege, the testimony presented an issue which should have gone to the jury. 103 Ark. 231; 146 S. W. 497; 107 Ark. 158; 154 S. W. 215.

*Thos. B. Pryor* and *Ponder & Gibson,* for appellees.

1. The statement attributed to Daniel was a privileged communication, coming under the class of conditional or qualifiedly privileged communications, and the question whether or not it was privileged was primarily a question of law for the court. 17 R. C. L. 328, 329, 341; *Id.* 356; 100 Ark. 477; 83 Pac. 444; 81 Atl. 1013; 42 So. 591; 83 Pac. 131; 4 L. R. A. (N. S.) 1091; Newell on Libel & Slander, 477-78; *Id.* 48; 23 Ill. 498. A communication is qualifiedly privileged where made in good faith in the performance of duty, or where the situation is such that it becomes right in the interest of society to make the communication. 56 Am. St. Rep. 170 and note; 40 L. R. A. (N. S.) 1102; 86 Am. Dec. 84; 76 N. W. 961; 21 Atl. 154; 39 Atl. 4; 70 S. W. 607; 48 N. W. 555. And the party making the statement is protected, if it is made to a party having a corresponding interest, even though

it contains matter which, without such interest, would make it actionable. 110 Pac. 181; 45 L. R. A. 735; 22 Am. Dec. 418; 46 N. W. 5; 41 Am. St. Rep. 863 and note; 78 S. W. 1071. See also 51 N. E. 811; 11 S. W. 555; 25 Cyc. 547; 95 Ark. 539; 15 Am. St. Rep. 794; 11 Am. Law Rep. 1010; 5 *Id.* 451; 46 L. R. A. (N. S.) 104; 123 Pac. 478. In cases of qualified privilege the burden of proof rests on the plaintiff, and malice will not be inferred, but must be proved. 13 Am. St. Rep. 775; 1913 Ann. Cas. 1070 and note; 7 A. & E. Ann. Cas. 192; 3 A. L. R. 1351; 56 Am. Rep. 274; 109 Mass. 193; 19 Barb. (N. Y.) 111; 3 L. R. A. (N. S.) 696; 16 L. R. A. (N. S.) 1017; 18 A. L. R. (N. S.) 1032; 81 N. W. 792.

2. The appellee Missouri Pacific Railroad Company is not liable for the statements made by appellee Daniel, the same not being within the scope of his authority, nor authorized, ratified or approved by the company. Wood on Master & Servant, §§ 279 and 307; 32 S. E. 392; 45 S. E. 532; 62 Am. St. Rep. 320; Newell on Libel & Slander, 361; 43 So. 210; 95 Ark. 534; 105 Ark. 326.

SMITH, J. Appellant Polk brought this suit to recover damages for certain alleged slanderous statements made by appellee Daniels, individually and in his capacity of superintendent of the White River division of the Missouri Pacific Railroad, in the presence of certain witnesses, whose names were set out in the complaint. The statements were: "Mr. Polk, are you prepared to reimburse the company for the time you defrauded them out of? Unless they are reimbursed, you stand liable to criminal prosecution by the company."

The railroad and Daniels answered and admitted that Daniels had used the language quoted, but alleged that it was privileged, and the trial court accepted that view, after hearing the testimony in behalf of the plaintiff, and directed a verdict in favor of the defendants.

Polk testified that on the 8th of September, 1920, the defendant Daniels, acting in his capacity as super-

intendent of the railroad company, requested him to be present at a meeting to be held in the office of the superintendent at Aurora, Missouri, for the purpose of investigating the question of the seniority of an employee of the company named Grooms, and that in compliance with that request he was passed without paying transportation, so that he could attend the meeting, and, while being examined by the said Daniels, acting for the said railroad, he was asked the question set out above in the presence of a man named Donne and another named Moreland, the persons named in the complaint as being present, and that said statements were false and humiliating.

The testimony developed the fact that Daniels was hearing the grievances of certain employees who were members of the United Brotherhood of Maintenance of Way Employees, and Moreland and Donne were officers of that organization, and it was their business and duty to be present at such hearing to present the cases of the aggrieved employees who were members of that order.

Polk had corresponded with Daniels about his own seniority as a section boss, in which capacity he was employed by the railroad company. He had also made complaint about the discharge of one of his sons who had been employed by him as a member of his section gang. It is the insistence of Polk that there was no charge against him, and that he was present for the purpose only of giving testimony in the matter of the seniority rights of Grooms, who was also a section hand and who had been discharged by the company, and that Donne and Moreland were not interested in the statement complained of, and that it was collateral to any subject under inquiry, and that Daniels took advantage of the occasion to vent his anger against the plaintiff, and that the statement had no relevancy to any matter under consideration. If the testimony is legally sufficient to support that contention, then a case was made for the

jury, and a verdict should not have been directed in favor of the defendant.

Polk testified that two of his sons had been members of his section gang, and that one of them had been laid off and the other one discharged, and that he wrote to W. W. Gnadt, at St. Louis, Missouri, wanting to know why they were laid off, and also why Grooms was laid off. Gnadt was the general chairman at St. Louis of the brotherhood of which Polk was a member, and it was Gnadt's duty to see that investigation was made of complaints similar to the one which Polk had lodged with him. Polk testified:

"I called the general chairman at St. Louis and asked him to have an investigation of cutting the boys off, and also relative to one of the Grooms boys, who had been laid off at Sulphur Rock for three weeks or something like that, and the general chairman sent me a letter and informed me that Moreland would be in Aurora, Missouri, on the 9th of September, 1920." He was asked: "So you went up there to investigate the discharge of Frank (Polk)?" and answered: "Frank and the Grooms boy. While the Grooms boy was not discharged, he was just laid off." He was also asked: "So you went over to Aurora on September 8, 1920, for the purpose of having an investigation there before the superintendent, Daniels, in his office, to see whether or not they were right or wrong in discharging your boy Frank?" and answered: "Yes sir, and young Grooms. I intended to bring that up, too, and my seniority right also, while I was there."

It appears that there is, or was, a clause in the contract between the railroad company and the Brotherhood of Maintenance of Way Employees which provided that any employee who was a member of that order and who was disciplined or dismissed should be entitled to a hearing before his dismissal became final. The right to discharge existed, but, under the railroad's agreement with the brotherhood, it was customary for the aggrieved employee to go to the officer of the railroad company

having the matter in hand, together with some officer of the brotherhood, to investigate to see if the discharge was rightful.

Donne testified that in Daniels' cross-examination of Polk he asked about the employment of Polk's son, and advised Polk that an investigation had been made of the time-books kept by Polk as far back as January, 1919, and that he found certain days in the months of March and December, 1919, and a day in January, 1920, when Polk had put in time for his son when the son had not worked. Polk denied this, and, after some further discussion, Daniels made use of the language quoted which is the basis of this action.

Moreland then intervened and asked: "Are you discharging this man? If you are, why?" Daniels replied: "You have heard my statements. We can verify them." Moreland then asked: "You are discharging this man for padding the payrolls?" and Daniels stated that he was. Polk was then excused, and in his absence Moreland and Donne discussed the matter with Daniels. Daniels' stenographer was present and reported the proceedings, and at the conclusion of the conference Moreland asked for the charges in writing and for a transcript of the examination of Polk by Daniels, who assured Moreland his request would be complied with. Moreland was entitled to make this request, and it was Daniels' duty to comply with it, as the representative of the railroad, under the terms of the contract between the railroad and the Brotherhood of Maintenance of Way Employees.

Moreland was asked this question: "Did you make this statement that day: 'I came up to investigate and have a trial for Mr. Polk's boys'?" and he answered: "If I am not mistaken, it was Polk's boy's case I handled, and not Grooms'."

Donne was asked: "And you were present at Aurora with Mr. Polk and Mr. Moreland on this day, representing the brotherhood and Mr. Polk in his investi-

gation?'' and he answered: ''I was representing Mr. Polk.''

It does not appear that Polk knew any charge had been ·preferred against him, but he knew the discharge of his son would be inquired into, for this was one of the matters which he had asked to have investigated, and he had been notified by the representative ,of the order of which he was a member when and where the investigation would be made, and the investigation was being held. pursuant to his request.

The facts in the case of Polk and that of his son appear to be identical, and that is that the railroad contended that the son had been carried on the payroll when he was not working. This was a matter about which Daniels examined Polk, and his answers appeared not to have been satisfactory. If Polk was in fact padding the payroll, this was ample justification for not only discharging the man whose name was being fraudulently carried on the payroll, but also for discharging the man who committed the fraud, and this fact was the reason assigned by Daniels at the hearing before him for the discharge of Polk's son and of Polk himself.

We think the language of Daniels, quoted above, was uttered under a qualified privilege. The law in such cases was stated in the case of *Bohlinger* v. *Germania Life Ins. Co.*, 100 Ark. 477, as follows: ''A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable. Upon such occasion and under such circumstances. although the matter communicated is defamatory and false, the law will not infer malice, but the existence thereof must be shown by some evidence beyond the falsity of the statements communicated.''

In the case of *Christopher* v. *Akin*, 46 L. R. A. (N. S.) 104, 214 Mass. 332, 101 N. E. 971, the Supreme Court

of Massachusetts said: " * * * Whether a communication is or is not privileged does not depend so much on the manner or form in which crime is imputed, where the alleged slander consists, as here, of a charge of crime, as on the occasion and circumstances under which the charge is made. If made in good faith in reference to a matter in which the person making it is immediately interested, and for the purpose of protecting his interest, and in the belief that it is true, and without any malicious motive, the communication is what is termed privileged; that is, the occasion and the circumstances under which it is made are held to be such as, if nothing more appears, to excuse or justify the statements that are made."

A similar statement of the law is found in Newell on Slander and Libel (3d ed.) pp. 477, 478, and also in the numerous cases cited in appellees' brief.

The only testimony here which would indicate malice or other improper motive on the part of Daniels is the testimony of Moreland that Daniels appeared to be antagonistic in his examination of Polk. But we think that testimony insufficient to support a finding that Daniels was prompted by malice. Daniels' belief in Polk's guilt, which was apparently sincere, although we presume it was mistaken, would make him antagonistic to Polk. There was no denunciation or abuse, nothing except earnestness in the examination of Polk by Daniels, and the language quoted as actionable was not collateral to the inquiry because the discharge of Polk's son was one of the subjects of the inquiry, and, as we have said, the alleged cause of the son's discharge furnished equal ground for the discharge of Polk himself.

In exoneration of the railroad, counsel for it cites the case of *National Packing Co.* v. *Boullion,* 105 Ark. 326, and other cases to the same effect, holding that, to establish liability against a corporation for slander, the utterance of the slander must be shown to have been made by its authority or ratified by it, or to have been

made by one of its servants or agents in the scope of his employment, and in the course of the business in which he is employed. This is, of course, the correct test of a corporation's liability for slander. But we think, under that test, the jury might have found that the railroad would be liable if Daniels is liable, upon the ground that Daniels was acting within the scope of his employment, and in the course of the business in which he was employed, in repeating, in the presence of Moreland and Donne, the ground of the company's complaint against Polk and the reason for his discharge, for, as we have said, the railroad was required to furnish specifications of the charges, and to do so in writing when requested so to do, and Daniels was the employee of the company whose business it was to discharge that duty.

There was no testimony that any rules of procedure had been prescribed for such a hearing as was had at Daniels' office, and Daniels complied with the terms of the agreement between the railroad and the Brotherhood of Maintenance of Way Employees when he offered to furnish in writing the specifications of the charges on which Polk was discharged.

We conclude therefore that the verdict was properly directed in defendant's favor, and the judgment is affirmed.