Mae SMITH, (plaintiff) Appellant,

v.

J. J. NEWBERRY COMPANY and Walter Tobias, (Defendants) Respondents.

No. 31717.

St. Louis Court of Appeals.

Missouri.

Oct. 19, 1965.

James F. Koester, St. Louis, for appellant.

Evans & Dixon, Henry D. Menghini, St Louis, for respondents.

RUDDY, Presiding Judge.

This is an action to recover damages for slander, brought by plaintiff against defendants, J. J. Newberry Company, a corporation, and its store manager, Walter Tobias. A jury trial resulted in a verdict for plaintiff against both defendants for $5000 actual damages and $2000 punitive damages or a total of $7000. The separate after trial motions of the defendants for judgment in accordance with their motions for a directed verdict were overruled and their separate motions for a new trial were

sustained on the ground that the verdict was against the weight of the evidence. From the order and judgment sustaining defendants' motions for new trial plaintiff has appealed.

Plaintiff contends that the action of the trial court in sustaining the motions of the defendants for a new trial was an abuse of discretion because defendants failed to offer any evidence whatsoever in defense of plaintiff's action. Defendants deny this contention made by plaintiff and they contend that plaintiff failed to make a submissible case against either defendant. This contention of the defendants was duly preserved by them in the trial court by timely trial motions and in their after trial motions to set aside the verdict and to enter judgment in their favor or in the alternative for a new trial and, therefore, they are entitled to have this contention considered on appeal even though the defendants have filed no appeal. Wilhelm v. Haemmerle, Mo., 262 S.W.2d 609; Whalen v. St. Louis Public Service Co., Mo.App., 351 S.W.2d 788.

As said in the case of Masdon v. Stine, Mo.App., 66 S.W.2d 579, it needs no citation of authorities on the point that if there was not a submissible case made, the court should have given the peremptory instructions and sustained defendants' motions for directed verdict and it is just as true that if there was not a submissible case under the evidence, then the court had no right to grant a new trial because the verdict was against the weight of the evidence.

Our first duty is to determine whether or not defendants' contention that plaintiff failed to make a submissible case has merit. In doing so, we are constrained to view the evidence in the light most favorable to the plaintiff, giving her the benefit of all reasonable inferences therefrom, not in conflict with her theory. Whalen v. St. Louis Public Service Co., supra.

Plaintiff started to work for the defendant, J. J. Newberry Company, in April of 1951 and worked for them continuously until the time she was discharged on May 15, 1958. Her initial position was that of saleslady and she continued in this position until the time of her discharge, at which time she also worked in the stockroom. She was a salaried employee and when the sales would increase she would receive a bonus. A part of her duties as a saleslady was to ring up the cash sales on the cash register provided for that purpose. Prior to the time defendant Tobias came to the store as manager, she was working on the first floor of the store in Men's and Boy's Wear, but when Tobias came to the store as manager, she was put in a department in the basement known as the pet and tinware department. She said the work in that department was "far more menial in that department," adding, "we had to scrub bird cages and things like that and, fish bowls." When Tobias first came to the store as manager she worked 40 hours a week. At the time of her discharge and shortly before that she worked part time and each week's time varied between 18 and 24 hours per week.

While she was assigned to the pet and tinware department in the basement she was required to makes sales in any of the departments of the basement when she was needed. There were four cash registers in the basement. Each cash register was for a different department. It seemed that there was a cash register on the east side of the store for the pet and tinware department and one for the toy department and one in the middle of the store for men's and boy's wear and one in the back, that is, on the other side of the basement from the department in which plaintiff worked, for hardware and two or three other departments. Plaintiff and the other sales ladies were under instructions to use the cash register in the department in which the sale was made. This was done in order to keep a record of the sales made by each of the departments involved. This procedure was

followed because Tobias told them that "he wanted us to increase our sales in those departments and the only way we could do that was to ring the registers in those departments." Plaintiff said that at one time there was no special register assigned to any girl or department and that they could ring up the sales on any register but that this arrangement was changed by Tobias, as heretofore stated. All sales had to be rung up on the register because, as she said, "the rule was we were not to carry any money on our persons."

On May 15, 1958, between 2 and 3 P.M., which was during the normal working hours of the plaintiff, she was summoned by defendant Tobias to the ladies lounge on the second floor of the J. J. Newberry Company's store. It was at this time that the words were uttered that form the basis of this lawsuit. Prior to the time she was summoned to the ladies lounge on the second floor, she was engaged in some sales transactions in the basement, one of which transactions ultimately led to the conversation in question. In relating the sales transactions plaintiff said she was standing at the wrapping station, which is approximately in the center of the basement, and just to the left of where she was standing there was a cash register two or three feet away from the spot where she was wrapping a large package of merchandise, which she said included a large bread box two or three feet square and other items which came to a total sales price of $6.00. The lady purchaser of these items had handed plaintiff a ten dollar bill. Before she rang up this sale and deposited the $6.00 in the cash register, a Mrs. Nell Crossman, who was later identified as a Pinkerton detective agent, walked up to the plaintiff and handed her a hammer and a five dollar bill and asked to be waited on immediately. Plaintiff said in order to expedite the sale, because she had 3 or 4 more people to wait on, she put the five dollar bill in the cash register near her which was open at the time and took out five single dollar bills and gave Mrs. Nell Crossman $4.00 and kept one of the dollar bills in her

(plaintiff's) hand. She did not ring up this sale of the hammer on the cash register out of which she took the change, but immediately after taking out the change for the five dollar bill she started to walk to the other side of the store and there rang up the one dollar sale for the hammer in the cash register provided for hardware department sales, together with another ten cent sale that she had made as she was walking across the store and, as plaintiff said, "that completed the transaction as far as I was concerned."

At the time the sale for the hammer was made plaintiff did not know that Mrs. Crossman was an agent for the Pinkerton Company; she did not identify herself and all that Mrs. Crossman did was to hand plaintiff a hammer and a five dollar bill, together with a bag. Plaintiff said that when she made the change of five one dollar bills for the five dollar bill handed her by Mrs. Crossman, another employee, named "Mary," had just used the register and it was still open and that she told Mary, "I am taking change out of the register." Plaintiff said in the course of the sale of the hammer to Mrs. Crossman she had money from three different people for sales and had not rung them up on the cash register because she was trying to wait on all the people before ringing up the sales. It was shortly after plaintiff completed the transactions referred to above that she was summoned by Tobias to the lounge on the second floor.

When she arrived at the lounge, Tobias and a lady (Mrs. Crossman), whose name at the time she did not know, were present. She said she did not see anyone else present when she first went in. Because of the contentions raised by the defendants we feel it necessary to set out the exact conversation that took place between Tobias and plaintiff. When plaintiff was asked to tell what conversation "ensued up there," meaning in the lounge, she answered:

"Mr. Tobias asked me if I remembered this lady, that's the first words he spoke

as I remember, he said, 'Do you remember this lady?' And I said, 'Yes, I do.' And I did, I remembered her. And he said, 'Did you wait on her?' And I said, 'Yes.' And he said, 'What did you do with the money that you took from her?' And I said, 'Well, I rang it up, of course.' And he said, 'She said you didn't ring it up.' And I said, 'Mr. Tobias, are you accusing me of taking the money?' And he said, 'Well, she said you took it.' And I went and I said, 'Well, if you are accusing me of stealing, well, I want to be searched.' And he said, 'It doesn't necessarily mean if there is no money on your person that you haven't hidden it in the store somewheres.' Those were the words he used. Q. Was there other conversation then, following this, pertaining to being fired and so forth? A. Yes. He had already said—because he said, when she said that I had taken the money, that I hadn't rung the money up, I said, 'Mr. Tobias, are you accusing me of stealing?' And he said, well, that was proof enough for him. He said, 'You can go get your money.' He said, 'It's ready for you.' And I said to him, 'Do I look like a thief?' And he said, very sarcastically, he said, 'Do thieves have a special look?' "

No search of plaintiff's person was made in the store.

In her cross examination plaintiff testified that the conversation just related took place during her normal working hours and that Tobias was an employee of the J. J. Newberry Company at the time and that she was one of the employees that worked under his supervision. She said all of the conversation that took place related to the transaction that had taken place a little bit earlier in the basement with Mrs. Nell Crossman. In the course of her cross-examination the following testimony was given by plaintiff:

"Q. Will you explain to the Court and jury why you brought up the question of stealing, when Mr. Tobias asked you about this particular sale? * * * A. I brought it up in answer to his asking me what I did with the money, and then he said, Mrs. Crossman said I didn't ring it up. Q. If you hadn't rung up some money, that would be a violation—A. That would be stealing, if I hadn't rung it up. Q. Would it necessarily be stealing? Might not that just mean you didn't ring up the sale? Wouldn't that be possible? A. No, because the rules were that we were to ring them up." Again she was asked "Q. Why did you think anybody was accusing you of stealing; why did you ask that question at that point? A. Because I realized if I hadn't put it in the register—the rule was we were not to carry money on our person, and if I had not put it in the register, I would have it on my person." She said that at the time she was sure someone was accusing her of stealing the money.

On redirect examination plaintiff said that Tobias did not tell her what she was being fired for, that is, whether for not ringing up the sale or not using the right cash register. Parts of a deposition of Tobias were introduced in evidence by the plaintiff wherein Tobias testified that Mrs. Crossman, the Pinkerton agent, was not aware of the fact that the money had been put in another cash register.

In her direct examination plaintiff was asked, if during the first of the conversation between herself and Tobias, anyone entered or came into the ladies lounge. She answered, "Yes, I think this girl was in there all the time. She came out of one of the booths. Q. Are you referring to one of the employees? A. One of the employees; Hazel Fotsch."

Following the conversation that took place in the lounge, plaintiff was immediately discharged and thereafter she con-

sulted Mr. Robert E. Sargent, Senior Business Agent of the Retail Employees' Union, of which union plaintiff was a member. Thereafter, plaintiff went to work for Woolworth Company where she was employed as a cashier and bookkeeper.

Robert E. Sargent testified that prior to the incident in question there had never been any complaints concerning the integrity of plaintiff. Another witness testified that she was acquainted with plaintiff for 9 years and that her reputation for honesty was very high. She was aware that plaintiff had been discharged from the J. J. Newberry Company.

During the course of the direct examination of Mary A. Massie, a witness offered by plaintiff, she was asked: "Mrs. Massie, did you overhear or become aware, or, of your own knowledge, know any incident involving Mae Smith and Mr. Tobias, that occurred prior to May 15, 1958? A. I don't know what you mean by 'incident.' Q. Well, anything that would evidence or show any hard feeling or bad feeling between these two people." Thereafter, the attorney for the defendant objected to the question as calling for speculation, conjecture and for an opinion of the witness. The court sustained the objection. The witness was then asked if it was general knowledge among the sales people or personnel of the store as to the reason for plaintiff's discharge and an objection to this question was sustained by the court.

During plaintiff's direct examination she said that when Mr. Tobias first came to the store the relationship between her and him was very friendly and that she never noticed any unfriendliness in his attitude. Thereafter, she was asked this question: "Was there quite a drastic change in Mr. Tobias' attitude toward you and his treatment of you?" She was asked this question after she testified that his attitude later had changed quite definitely. An objection was made by defendants' counsel to this question and the objection was sustained by the court. Thereafter, plaintiff's counsel

asked the court: "Are you going to sustain any objection as to the relationship between the plaintiff and the individual defendant prior to this occurrence?" The court then asked plaintiff's counsel if there was anything special that he had in mind and thereafter a discussion took place off the record. The nature of the discussion is not shown in the record before us. Upon returning to the record the court said: "Yes. I would sustain an objection to that, if asked." We can only assume that the discussion that took place off the record had to do with the question propounded to the court by plaintiff's counsel as to whether or not the court was going to sustain any objection as to the relationship between the plaintiff and the individual defendant prior to the occurrence in question.

After plaintiff had concluded her evidence and her attorney had informed the court that the evidence offered "will conclude the plaintiff's case," defendants' attorney told the court that he was not going to put on any evidence. At this point defendants' attorney filed a written motion in behalf of each defendant for a directed verdict, which motions were overruled by the court. Thereafter, the record shows the following proceedings took place in the chambers of the court, not in the presence of the jury:

"Mr. Menghini: (attorney for defendants) It appears that the plaintiff's attorney wishes to make an offer of proof, and I object to the Court entertaining an offer of proof at this time, for the reason that it is not timely; and, furthermore, that the plaintiff's case has been closed and motions for directed verdict, as to both defendants, filed and ruled upon.

"Mr. Byrne: (attorney for plaintiff) I would like to make the following offer of proof; namely: That had plaintiff been permitted to testify concerning the relationship between she and the co-defendant, Mr. Walter Tobias, immediately prior to the occa-

sion out of which the lawsuit arose, that the evidence would have shown that Mr. Tobias' feeling changed from one of good-will towards plaintiff to one of spite and malice, and that this was brought about by plaintiff, Mae Smith, walking into a room in which the Defendant Tobias was engaged in an embrace with a married woman employee, a woman other than his wife; and that subsequently to that occasion, Defendant Tobias, as manifested by his subsequent conversations and actions with the plaintiff, namely: demeaned her in her position at the store in the type and caliber of work that she subsequently did; and, in his conversations with her, manifested an ill-will and malice toward her, and that this ill-will and malice, because of this prior situation, is what occasioned, in fact, the occurrence complained of in plaintiff's petition, and was the outcome or was the precipitating factor in the utterance of the slanderous words, as alleged by plaintiff."

Defendants' attorney then renewed his objection to the offer of proof and moved to have it stricken from the record, which motion and objection were sustained by the trial court.

In support of their contention that plaintiff failed to make a submissible case defendants assert that plaintiff's evidence showed affirmatively that whatever words were spoken by defendant Tobias on the occasion in question were spoken on an occasion of conditional or qualified privilege and that the trial court so ruled in reading defendants' instruction No. 5 to the jury. They further assert that inasmuch as the words were spoken upon an occasion of conditional or qualified privilege, it was necessary for plaintiff to produce substantial evidence of actual malice toward the plaintiff on the part of either defendant and that plaintiff failed in this respect and for this reason failed to make a submissible case.

■ It is true that the court in its instruction No. 5 offered by the defendants and given by the court told the jury that the occasion on which the publication complained of in this action by the plaintiff was made was a privileged occasion and further instructed the jury, "and therefore unless you should find from the preponderance or greater weight of the credible evidence that in speaking the words charged defendant Tobias was actuated by actual or express malice, then your verdict should be for both defendants." We think the trial court was correct in ruling, as a matter of law, that the occasion on which the words were uttered was one of qualified or conditional privilege. Hellesen v. Knaus Truck Lines, Inc., Mo., 370 S.W.2d 341; Rauch v. Gas Service Co., 241 Mo.App. 976, 235 S.W.2d 420; Gust v. Montgomery Ward and Co., 229 Mo.App. 371, 80 S.W.2d 286.

In the case of Hellesen v. Knaus Truck Lines, Inc., supra, the Supreme Court, quoting from an opinion in an Arkansas case [Polk v. Missouri Pac. R. Co., 156 Ark. 84, 245 S.W. 186, 29 A.L.R. 220] said:

" ' "A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable. Upon such occasion and under such circumstances, although the matter communicated is defamatory and false, the law will not infer malice, but the existence thereof must be shown by some evidence beyond the falsity of the statements communicated." ' " (370 S.W.2d 1. c. 345.)

In the case of Garey v. Jackson, 197 Mo. App. 217, 193 S.W. 920, which was an action for slander, we said at 1. c. 922:

"It is the law in this state that before the defense of qualified priv-

ilege is available it must appear that the statements made by the defendant were made in the discharge of some duty, either public or private, either legal, moral, or social, to a person or persons having a corresponding interest or duty, and were spoken in connection with and were relevant and germane to some matter involving such an interest or duty, and that the words were spoken in the interest of or for the protection thereof. In addition they must have been uttered in good faith and spoken on a proper occasion, from a proper motive and based upon a probable cause, and in the honest belief that such statements were true. The duty or interest on which the privilege is founded must actually exist, and it is not sufficient that the defendant honestly believes that such duty or interest exists. It is the surrounding circumstances as they appeared to the defendant at the time of the utterance of the words that the court considers in determining the question of privilege."

To the same effect, see 53 C.J.S. Libel and Slander § 89, pages 143, 144, 145; Rauch v. Gas Service Co., supra; Boehm v. Western Leather Clothing Co., Mo.App., 161 S.W.2d 710; Gust v. Montgomery Ward and Co., supra.

We think the words uttered by Tobias were actionable per se in that the conversation when considered in its entirety charged plaintiff, as she understood, with the stealing of the money in connection with the sale of the hammer to Mrs. Nell Crossman, the Pinkerton detective. However, notwithstanding the actionable nature of the words and their defamatory character and their apparent falsity, there can be little doubt that they were uttered in connection with the discharge of a duty that Tobias had as manager of the J. J. Newberry Company store to the plaintiff who had a corresponding duty to the corporate defendant, her employer. The words spoken were relevant and germane to a transaction that

plaintiff had consummated with Mrs. Nell Crossman. The words spoken by Tobias were in the interest of and for the protection of the corporate defendant. The words were uttered on a proper occasion, during normal business hours and were based upon a probable cause, inasmuch as Mrs. Nell Crossman, the Pinkerton detective agent, had reported the transaction to Mr. Tobias and he in the honest belief that her report was true, questioned the plaintiff who had a duty in the transaction. No doubt exists that both the defendant Tobias and the plaintiff had a duty and interest in connection with the matter discussed in the lounge on the second floor of the corporate defendant's store. The words uttered and circumstances related above form a sufficient basis to support the defense by defendants of qualified privilege.

As said by the Supreme Court in the Hellesen case, upon such a privileged occasion and under such circumstances although the matter communicated is defamatory and false, the law will not infer malice but the existence thereof must be shown by some evidence beyond the falsity of the statements communicated. As we said in the case of Boehm v. Western Leather Clothing Co., supra, the occasion of qualified privilege rebuts the presumption of malice which the defamatory publication otherwise imported, "the question then resolves itself into one of whether there was evidence of actual or express malice" on the part of the defendant "so as to have overcome and destroyed the privilege and have prevented the occasion from furnishing a legal excuse." (161 S.W.2d 1. c. 717.) We said in that case:

"By actual or express malice is meant malice in fact as distinguished from implied malice, that is, the actual presence of an improper motive on the part of the defendant implying the purpose and desire to injure. It may, and in common acceptation does, denote that the defendant was actuated by spite or ill will towards the plaintiff, but in its

legal significance such degree of personal hostility is not in all events essential. On the contrary, it is the willfulness or evil intent of the act—the wanton disregard of the rights and interest of the party injured—which suffices to render the act malicious in its legal sense; and hence the usual definition that by malice is meant the intentional doing of a wrongful act without just cause or excuse." (161 S.W.2d 1. c. 717).

It is true that on some occasions when intemperate language is used it serves to destroy the qualified privilege. However, we find no words used by defendant Tobias at the time of the conversation in question, with the plaintiff, that can be called intemperate language or held to be expressions in excess of what the occasion warranted. Boehm v. Western Leather Clothing Co., supra; Gust v. Montgomery Ward & Company, supra.

In the case of Garey v. Jackson, supra, we said that the occasion on which a qualified privileged communication is made rebuts the inference arising, "prima facie, from a statement prejudicial to the character of the plaintiff, and puts it upon him to prove that there was malice in fact, and that the defendant was actuated by motives of personal spite or ill will independent of the circumstances in which the communication was made." (193 S.W. 1. c. 923.)

When there is a sufficient basis to support the defense of qualified privilege it becomes the burden of the plaintiff to prove that the statements complained of were actuated by express or actual malice. We find no evidence in this record to show that defendant Tobias was actuated by a wilful or evil intent in uttering the words charged by plaintiff and, as the cases hold, where there is an absence of the intentional doing of a wrongful act without just cause or excuse, there is no showing of express or actual malice. There is nothing in the evidence to show that prior to the

conversation that led to plaintiff's discharge there had been any personal disagreement between plaintiff and defendant Tobias. While it is true that she testified that after Tobias came to the store as manager she was put in the department that required a more menial type of work and that she had worked 40 hours a week prior to his arrival but thereafter she only worked on a part time basis, however, this testimony without more is an insufficient basis for showing express malice on the part of defendant Tobias. It is true that plaintiff testified that the attitude of defendant Tobias toward her had changed and because of the court's action in sustaining an objection by defendants' counsel to a subsequent question that pertained to the nature of the change in the attitude, plaintiff was prevented from further testifying in this area. As we shall point out later, we think the court erred in not permitting plaintiff to testify to the relationship that existed between the plaintiff and defendant Tobias prior to the day of her discharge.

Heretofore we have summarized all of the evidence presented to the jury and after careful examination of this evidence we find nothing that would support a finding by the jury of actual or express malice on the part of either defendant. In view of our finding that the conversation forming the basis of the charge of slander was made upon an occasion of qualified privilege and that there is no evidence upon which a jury could find the existence of actual or express malice, the trial court should have sustained the defendants' motions for directed verdict at the close of plaintiff's case. Ordinarily, such a finding on our part would require a reversal of the court's order and judgment, with directions to enter a judgment for the defendants.

▬ However, we think the trial court erred in not permitting the plaintiff to testify to the relationship that existed between the plaintiff and defendant Tobias

prior to the day of her discharge. We also think that the trial court erred in not permitting plaintiff, after the close of her case, to testify concerning the changed relationship and attitude of defendant Tobias, which in her offer of proof she said resulted from an incident wherein she (plaintiff) walked into a room in which defendant Tobias was engaged in an embrace with a married woman employee who was not his wife. In this offer of proof plaintiff wanted to show that subsequent to this incident defendant Tobias manifested ill-will and malice toward her. We think this evidence, if admitted, would have made a submissible jury case for the plaintiff on the question of the existence of actual and express malice.

Because of this plain error in the record, which obviously, if not corrected, will result in a miscarriage of justice, we feel compelled in the exercise of our discretion to resort to Civil Rule 79.04, V.A. M.R., which provides that plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom. Williams v. Southern Pacific Railroad Co., Mo., 338 S.W.2d 882; Johnson v. Kansas City Public Serivce Co., 358 Mo. 253, 214 S.W.2d 5. Plaintiff having received a verdict would not be required to file a motion for new trial and point out this error to the court and Civil Rule 79.04, supra, is provided as a safeguard against a situation such as this where some great wrong might be rendered unless resort was had to this rule. Harrison v. St. Louis Public Service Company, Mo.App., 251 S.W.2d 348.

Therefore, in the interest of justice and to avoid a miscarriage of justice, we have resorted to Civil Rule 79.04, supra, and we sustain the trial court's action in granting a new trial.

The order of the trial court sustaining defendants' motions for new trial is affirmed and cause remanded for a new trial.

ANDERSON, J., and FRANK D. CONNETT, JR., Special Judge, concur.